**2022 UT App 117**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHAD HINTZE,
Appellant.

Opinion
No. 20200787-CA
Filed October 14, 2022

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 181903394

David A. Ferguson, Attorney for Appellant

Simarjit S. Gill, Hyrum J. Hemingway, and Joey L.
Blanch, Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGE
DAVID N. MORTENSEN concurred. JUDGE RYAN D. TENNEY
dissented, with opinion.

HARRIS, Judge:

¶1      One day in 2016, Chad Hintze was sitting on a park bench
with a teenage family friend when three uniformed officers
approached him and began asking him questions. During this
questioning, officers learned Hintze's name and that he was a
convicted sex offender. Because he was a sex offender, Hintze was
not legally permitted to be in the park. As a result, the State
charged Hintze with one count of "violation by sex offender of
protected area."

¶2      But the State failed to prosecute the case—or even notify
Hintze of the charge—for over two years. Hintze finally learned
about the pending charge when corrections officials told him that

it made him ineligible for parole on another matter. Soon after learning about the pending charge, Hintze filed a motion to dismiss it, arguing that the State's delay in prosecuting him had violated his Sixth Amendment right to a speedy trial. The district court denied his motion, and Hintze later entered a conditional guilty plea that reserved his right to challenge the court's decision.

¶3　Hintze now takes up that challenge, and asks us to reverse the district court's denial of his motion to dismiss. We find merit in Hintze's arguments, and agree that his Sixth Amendment right to a speedy trial was violated. On that basis, we reverse his conviction and remand with instructions to dismiss the charge.

BACKGROUND

¶4　In 2011, Hintze was convicted of attempted unlawful sexual activity with a minor. *See* Utah Code Ann. § 76-4-101 (LexisNexis 2008); *id.* § 76-5-401. Because of this conviction, Hintze was required to register as a sex offender. *See id.* § 77-27-21.5(1)(n)(i)(V) (Supp. 2010).[1] And subject to a few exceptions not at issue in this case, it is accordingly a crime for Hintze to "be in a protected area." *Id.* § 77-27-21.7(3)(a) (Supp. 2022). By statute, "a community park that is open to the public" qualifies as a protected area. *Id.* § 77-27-21.7(1)(b)(i)(D).

*The June 2016 Park Incident*

¶5　On June 7, 2016, Hintze and a teenage girl were "eating snacks" and sitting "on [a] park bench" along the Jordan River Trail when three uniformed officers on bike patrol approached

---

1. Because of changes to the statutes that required Hintze to register as a sex offender, we cite the versions in effect at the time of his 2011 conviction. The current requirements for who qualifies as a sex offender can be found in Utah Code section 77-41-102(17) (LexisNexis Supp. 2022).

them. The officers stopped right in front of Hintze and the teenager and parked their bikes in front of and to the side of the bench where Hintze and the teenager were sitting.

¶6 The first officer asked, "[H]ow's it going guys? How old are you guys?" Hintze responded that he was twenty-three years old, and the teenager responded that she was thirteen.[2] The officer then asked how they knew each other. Hintze responded that they were siblings. But the officer doubted this because of "their complexions," so he said to Hintze, "[It] doesn't look like you guys are siblings." In response, Hintze told the officer that he was actually "adopted." When the officer pressed back on that, Hintze then replied that he was actually "kind of adopted into the family" and was "a family friend." At this point (which was about a minute into the encounter), the officer asked Hintze for his name and birth date, which Hintze provided.

¶7 While the first officer and Hintze were engaged in that conversation, the teenager called her mother. The teenager handed the phone to one of the other officers, and he then spoke to the teenager's mother. During that brief conversation, the mother provided the officer with Hintze's name and told him that Hintze was "a family friend." The officer responded by explaining that the officers "just wanted to make sure there wasn't anything

_____

2. The very early portions of the encounter (including this particular moment) were caught on video but not on audio. When describing this question and answer at the subsequent hearing, the officer testified that Hintze told him that he was twenty-two. But based on the birthdate that Hintze then gave the officer in a portion for which the audio was recorded (which matches Hintze's birthdate as indicated elsewhere in the record), Hintze would have been twenty-three. The difference between twenty-two and twenty-three is immaterial for purposes of the issues on appeal. For consistency, we assume for purposes of our analysis that Hintze was twenty-three at the time of this incident.

else going on here" and that they "just wanted to make sure" that the teenager "was safe." The officer then hung up and gave the phone back to the girl. As the encounter continued, an officer radioed in to dispatch "to check the identity" and run a warrants check on Hintze using the name and birth date provided by Hintze. From this, the officer learned that Hintze was a registered sex offender.

¶8     The girl's mother soon came and picked her daughter up, while the officers continued to talk with Hintze. After talking with him for about twenty minutes, the officers decided not to place Hintze under arrest, telling him that they didn't "feel that's the best avenue at this juncture." The officers instead allowed Hintze to walk away.

*The Initial Delay in Prosecution*

¶9     The State did not immediately file charges against Hintze based on the June 2016 park incident described above.

¶10     In March 2017, however, Hintze was charged with forcible sexual abuse, a second-degree felony, in a separate and unrelated case (case no. 171903226, hereinafter "Case 3226"). In June 2017, Hintze pleaded guilty in Case 3226 to an amended charge of attempted forcible sexual abuse, a third-degree felony. And in August 2017, Hintze was sentenced to a prison term of zero-to-five years based on that conviction.

¶11     On March 15, 2018, Hintze had an initial parole hearing in Case 3226, but the Board of Pardons and Parole (the Board) chose not to release him. Instead, it scheduled another hearing for March 2020, and told Hintze that he needed to complete a sex offender training program "before being considered for parole."

¶12     On March 23, 2018, the State finally filed a charge against Hintze related to the June 2016 incident described above (and which is ultimately at issue in this appeal). In the information, the

State charged Hintze with one count of "violation by sex offender of protected area," a class A misdemeanor. *See* Utah Code Ann. § 77-27-21.7. After the State filed this charge, however, there was "a mistake somewhere" on the part of the State, and as a result, Hintze "did not receive notice" of this charge for two years. Indeed, the State took no action to advance the case until prompted to do so by Hintze in March 2020.

¶13    By January 2020, while still in prison on Case 3226, Hintze had finished the sex offender treatment program that corrections officials had asked him to complete. But at his March 2020 parole hearing, the Board denied his request for parole. Hintze later testified that "what stopped [him] from being paroled" was the discovery that a "warrant" had been "filed that needed to be adjudicated." All parties agree that this was a reference to the charge in this case for the June 2016 park incident.

¶14    On March 16, 2020, just days after finally learning of the existence of the charge, Hintze wrote a letter to the district court in this case. In this letter, Hintze explained that he had "a case pending/warrant" and asked "to set up video court." He also wrote that he could not afford an attorney "and would like to be appointed one." Hintze's initial appearance was finally held on June 4, 2020—some twenty-seven months after the charge was initially filed—and trial counsel (Counsel) appeared on his behalf on June 10, 2020.

¶15    Counsel's first action was to request a preliminary hearing, which was held on July 8, 2020. Following the hearing, the court bound Hintze over for trial on the pending charge. After the bindover, Hintze requested discovery from the State, and then— some five weeks after the bindover order—he filed two motions.

*Hintze's Motion to Suppress*

¶16　One of the motions was to suppress evidence, in which Hintze argued that he was unconstitutionally seized before he gave his name to the officer. In support of his motion, Hintze made two principal arguments. First, he argued that he was seized when officers "pulled up in front of the park bench," "stood above him," and "launch[ed] into accusatory questioning" about his relationship with the teenager. Hintze argued that if he had "stood up to walk away" at that point, "he would have run into one of the three officers." In his view, this constituted a seizure. Second, Hintze argued that there was not reasonable suspicion to support a seizure at that point because "[t]here are a host of lawful reasons why a Hispanic adult male might sit on the same park bench as a White underage female." While acknowledging that he gave officers shifting explanations for his relationship with the teenager, Hintze asserted that there was still not a "particularized, articulable suspicion of a crime" at that point because people occasionally "give inconsistent, vague, evasive, or equivocating answers to police questioning" and also because Hintze's ultimate explanation (that he was something of an adopted brother) "is a fairly minimal faux pas" given that he is a "family friend."

¶17　The State opposed the motion and, after a hearing, the court denied it. Although the court found that "[t]he officers did ask the individuals their age very quickly," it concluded that "this [was] a casual encounter up to the point that the name [was] requested." And in the court's view, the officers had "reasonable articulable suspicion to investigate the relationship between [Hintze] and the young girl, given that [Hintze] ha[d] told the officer three different things regarding their relationship." The court further opined that the encounter was "still a level 1 stop" when the officer asked Hintze for his name because the officer had "turn[ed] away from [Hintze], turn[ed] his back to him and [began] dealing with dispatch." This, combined with the "very

short" duration of the interaction, Hintze's "casual" actions in continuing to snack and drink as the officers questioned him, and the fact that the officers had not drawn their weapons and had used a "normal" tone of voice, led the court to conclude that "someone in [t]his situation" would not "feel detained."

*Hintze's Motion to Dismiss*

¶18    Hintze's other motion was to dismiss the charge, claiming that his Sixth Amendment right to a speedy trial had been violated. Hintze relied on the four factors set forth in *Barker v. Wingo*, 407 U.S. 514 (1972), arguing as follows:

- Factor 1 (length): Two years had elapsed since his charge in this case, which was "sufficient to trigger a speedy trial analysis."

- Factor 2 (reason for delay): He was "not responsible for the delay in his prosecution."

- Factor 3 (assertion of right): He had timely asserted his right to a speedy trial, beginning with his March 2020 letter to the court and continuing with his August 2020 motion to dismiss, and had done nothing to delay the proceedings.

- Factor 4 (prejudice): He was prejudiced by the delay because he was "denied parole" in Case 3226 after "this case was filed."

*See id.* at 530.

¶19    The State also opposed this motion, and the district court later denied it as well. In its ruling, the court concluded that "the length of delay certainly trigger[ed]" a full four-factor *Barker* inquiry. With respect to those factors, the court (1) acknowledged that there had been a two-year delay but (2) determined that the reason for the delay was "a somewhat neutral factor" since there

was no evidence of bad faith on the part of the State. The court then concluded that (3) "[n]othing in [Hintze's March 2020] letter . . . assert[ed] a right to a speedy trial," though it "certainly stated I'd like a lawyer and I'd like to come to court." And finally, with regard to prejudice, (4) the court determined that there had not "been any prejudice to Mr. Hintze" that was not "incumbent on having criminal charges pending against an individual," and it also concluded that the reason for Hintze's parole denial in March 2020 was "somewhat speculative" because it was unclear whether the Board would have actually granted Hintze parole at that time. Looking at "the totality of the circumstances," the court ruled that Hintze's right to a speedy trial had not been violated.

*Hintze's Conditional Guilty Plea and Sentence*

¶20    On September 21, 2020, Hintze entered a conditional guilty plea to the charged offense, reserving the right to appeal the denial of the two motions described above and agreeing to be sentenced that day.

¶21    When Counsel then addressed the court about the potential sentence, Counsel noted that Hintze had been incarcerated in Case 3226 while this charge was pending. Based on that period of incarceration, Counsel asked the court not to impose an additional sentence here but to simply "close this case." In Counsel's view, Hintze should essentially be given "credit for time served."

¶22    When the prosecutor addressed the court, she asserted that "we'd be in a different posture" if the case had been timely prosecuted. Elaborating, she told the court that because Hintze had previously "committed crimes against minor individuals," "under normal circumstances" the State "would be asking for jail time" in this case and that it would be asking "for it to run consecutive" to his sentence for Case 3226. She said that the State would have made that request because this offense "required

some additional punishment" in light of Hintze's history. But even so, she "agree[d] with Defense counsel that" because this case had been "pending for two years," and because Hintze had been "in prison anyway" during that time, the State would not "ask[] for additional time in this case." She accordingly agreed with the request for the court to "close the case."

¶23 The court followed that recommendation. The court explained that although it had denied the speedy trial motion, it was "certainly . . . concerned about the failure to prosecute and move the case forward." "[F]or those reasons," the court concluded that it was "particularly appropriate to just simply close the case" and not "impos[e] any further sentence."

ISSUE AND STANDARD OF REVIEW

¶24 Hintze now appeals, and challenges the district court's denial of his motion to dismiss, which was based on an alleged violation of the Sixth Amendment right to a speedy trial. "Whether a defendant's right to a speedy trial has been violated presents a question of law, which we review for correctness."[3] *State v. Steele*, 2010 UT App 185, ¶ 14, 236 P.3d 161.

---

3. Hintze also challenges the district court's denial of his motion to suppress, which raised Fourth Amendment search and seizure issues. Judge Tenney discusses those issues at length in his dissenting opinion, and we note—for whatever it might be worth—that we do not take issue with Judge Tenney's analysis in that regard. But because we reverse Hintze's conviction on Sixth Amendment grounds—a matter upon which we *do* disagree with Judge Tenney—we need not reach Hintze's arguments regarding the propriety of the court's denial of his motion to suppress, and therefore do not incorporate any analysis of those arguments into our opinion.

ANALYSIS

¶25    "The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a speedy and public trial." *State v. Thompson-Jacobson*, 2022 UT App 29, ¶ 9, 508 P.3d 604 (quotation simplified). This right is a "fundamental" one, and "is imposed by the Due Process Clause of the Fourteenth Amendment on the States." *State v. Younge*, 2013 UT 71, ¶ 16, 321 P.3d 1127 (quotation simplified). But it is also an "amorphous, slippery, and necessarily relative" right, *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (quotation simplified), and it is one that "must take into account the defendant's rights as well as the rights of public justice," *State v. Samora*, 2022 UT App 7, ¶ 18, 504 P.3d 195 (quotation simplified).

¶26    In *Barker v. Wingo*, 407 U.S. 514 (1972), the court set forth the familiar four-factor framework by which we evaluate a Sixth Amendment speedy trial claim. Under this framework, we consider (1) the "[l]ength of delay," (2) "the reason for the delay," (3) "the defendant's assertion of his right," and (4) whether there was "prejudice to the defendant" resulting from the delay. *Id.* at 530. When assessing whether a defendant's speedy trial right was violated, courts "engage in a difficult and sensitive balancing process." *Id.* at 533. "None of the factors are necessary or sufficient; rather, the factors are related and should be considered together with other relevant circumstances." *United States v. Koerber*, 10 F.4th 1083, 1109 (10th Cir. 2021) (quotation simplified); *see generally Bennett v. Bigelow,* 2016 UT 54, ¶ 38 n.65, 387 P.3d 1016 ("Although we are not bound to follow precedent from the circuit courts of appeal on questions of federal constitutional law, the reasoning in these cases is persuasive . . . .").

A

¶27    The first *Barker* factor—the length of the delay—presents "a double enquiry." *See Doggett v. United States*, 505 U.S. 647, 651

(1992). The first part of this double enquiry asks whether the delay was long enough to even trigger a full-blown *Barker* analysis; indeed, "if the delay is not uncommonly long, the inquiry ends there." *See Younge*, 2013 UT 71, ¶ 18 (quotation simplified). Delays in excess of one year are usually deemed something longer than mere "ordinary" delay, and thus long enough to trigger a *Barker* inquiry. *See Doggett*, 505 U.S. at 652 & n.1; *see also Thompson-Jacobson*, 2022 UT App 29, ¶ 10 (stating that, "as a general matter, a delay approaching one year is enough to trigger a speedy-trial inquiry" (quotation simplified)). For purposes of this inquiry, the clock starts running when the defendant is charged, and it stops running when he is tried or otherwise adjudicated. *See Barker*, 407 U.S. at 533; *Samora*, 2022 UT App 7, ¶ 22.[4] In this case, the State filed charges against Hintze in March 2018, but took no action in the matter until after March 2020, and did not complete its prosecution of Hintze until September 2020. This was a delay of over two years, and it was therefore more than enough to trigger the full four-factor *Barker* inquiry.

¶28    But the second part of the "double enquiry" is also worth a mention. In that part of the analysis, we must consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *See Doggett*, 505 U.S. at

---

4. In this sense, because a Sixth Amendment speedy trial claim looks to the delay from the filing of charges through the case's resolution, it is different from a claim that the government violated the defendant's rights by unnecessarily delaying the filing of charges, which is separately analyzed under the Fifth Amendment's Due Process Clause. *See, e.g.*, *State v. Hales*, 2007 UT 14, ¶ 42, 152 P.3d 321; *State v. Charles*, 2011 UT App 291, ¶ 22, 263 P.3d 469. Indeed, "no Sixth Amendment right to a speedy trial arises until charges are pending." *United States v. MacDonald*, 456 U.S. 1, 7 (1982). Accordingly, even though the State took over two years to even file the charge, for purposes of our analysis we do not consider pre-filing time as part of the "delay" at issue.

651–52. In this case, the State did nothing for two years—twice the length of time needed to trigger the *Barker* inquiry—in a relatively simple case that could have easily been resolved well within that time period. We disagree entirely with the dissent's conclusion that the only time period that really matters is "the six months between March and September 2020." *See infra* ¶ 137. The State forgot about this case for over two years after filing it, and that entire time period is relevant to the speedy trial analysis. In our view, this first *Barker* factor weighs clearly in favor of Hintze.

B

¶29    The second *Barker* factor requires us to examine the reason for the delay and, specifically, "whether the government or the criminal defendant is more to blame for that delay." *See Doggett*, 505 U.S. at 651. This is a crucial factor; indeed, the Supreme Court has described this factor as "[t]he flag all litigants seek to capture." *See United States v. Loud Hawk*, 474 U.S. 302, 315 (1986); *see also United States v. Seltzer*, 595 F.3d 1170, 1177 (10th Cir. 2010) (referring to this factor as "especially important").

¶30    In this case, the blame for the initial two-year delay between March 2018 and March 2020 rests *entirely* with the State. In many speedy trial cases, courts must analyze whether particular discrete periods of delay are attributable to one side or the other, and must first assess whether the defendant—as some defendants do, *see, e.g.*, *United States v. Koerber*, 10 F.4th at 1110 (stating that the defendant "intentionally delayed his case in order to try and obtain a dismissal with prejudice" on speedy trial grounds)—was purposely attempting to delay the case. Those kinds of hijinks are simply not at issue here; indeed, Hintze was unaware of the charges until March 2020, and he played no role in the delay up to that point. And the record contains no indication that Hintze bears any responsibility for any delay in obtaining appointed counsel; he requested an attorney in mid-March 2020 and was appointed one in early June 2020, and not

even the State suggests that this period of delay ought to be attributed to Hintze. After Hintze obtained counsel, the case proceeded relatively smoothly, without significant apparent delay on the part of either side.

¶31 After concluding that the State was solely responsible for any delay, we must next assess whether the State's reason for the delay was "deliberate, neutral, or valid." *See Thompson-Jacobson*, 2022 UT App 29, ¶ 13. "It is incumbent upon the government to present acceptable reasons for the delay." *United States v. Margheim*, 770 F.3d 1312, 1326 (10th Cir. 2014). All parties here, as well as the dissent, agree that the State's reason for delaying this case was simple negligence: the State appears to have forgotten about the case. And negligence is "an example of a neutral reason for delay." *See Thompson-Jacobson*, 2022 UT App 29, ¶ 13.

¶32 But even negligence-based neutral reasons for delay are weighed against the State: "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Doggett*, 505 U.S. at 657. After all, "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant," and therefore even negligence should be weighed against the State. *See Barker*, 407 U.S. at 531.

¶33 Thus, this crucial second factor weighs quite clearly against the State here, albeit less heavily than if there had been evidence of deliberate intent to harm Hintze's defense.

C

¶34 The third *Barker* factor requires examination of the defendant's assertion of his right to a speedy trial. It is, of course, primarily the responsibility of "the courts and the prosecutors to

assure that cases are brought to trial," but defendants bear some responsibility to demonstrably assert their right to a speedy trial. *Id.* at 529. Accordingly, "the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered." *Id.* at 528.

¶35 To be sure, Hintze did not file a formal motion invoking his right to a speedy trial until August 2020. But Hintze did not even know of the existence of this case until March 2020, so the two-year period between March 2018 and March 2020 cannot be held against him. Hintze obviously could not have invoked his right to a speedy trial during that time period.

¶36 And starting in March 2020, as soon as Hintze learned of the existence of this case, he took appropriate action aimed at speedily moving his case along toward trial. Indeed, his first action was to send a pro se handwritten letter to the court on March 16, 2020 asking "to set up video court"—a reasonable request given the fresh outbreak of COVID-19 that was then sweeping the world—and informing the court that he could not "afford an attorney and would like to be appointed one." Read liberally, in light of Hintze's pro se status at the time he wrote the letter, what Hintze was asking for was to get his case moving toward resolution, through trial or otherwise. It is an indication that—far from trying to delay his criminal case—Hintze was trying to accelerate it.

¶37 Hintze's letter is therefore different from the pro se letter at issue in *Thompson-Jacobson*. In that case, the defendant was incarcerated in Nevada and sent a letter, in 2009, to the Utah court "requesting a motion to dismiss form, information about his case, and a list of all the criminal defense forms." *See* 2022 UT App 29, ¶ 5 (quotation simplified). The court forwarded a copy of the letter to the prosecutor's office, but there was apparently no response to the defendant's letter, and the defendant did not follow up, at least not until 2013 after the State began to take action on the case.

*Id.* ¶¶ 5–6. Later, when the defendant claimed a Sixth Amendment violation, the court declined "to construe [the defendant's] letter as an assertion of a right" to a speedy trial. *Id.* ¶ 16.

¶38    In this case, Hintze did not just request "forms" and "information." He specifically asked for a hearing and for a public defender. Those are distinct requests that are each consistent with a desire to get the case moving toward trial after an inexplicable two-year delay. And unlike the defendant in *Thompson-Jacobson*, Hintze—upon being appointed counsel in June 2020—took timely follow-up action to invoke his right to a speedy trial: he immediately requested a preliminary hearing, which was held in July 2020, and about a month later filed his motion to dismiss on speedy trial grounds. Viewed with this context in mind, Hintze's March 2020 pro se letter was, in our view, a clear attempt to get the case moving more speedily toward trial.

¶39    We certainly acknowledge—and do not disagree with— the dissent's point that a defendant's invocation of his right to a speedy trial should be sufficiently specific to put the State on notice that the right is being invoked. *See infra* ¶ 83. But context matters. *See Thompson-Jacobson*, 2022 UT App 29, ¶ 23 (stating that the four *Barker* factors are to be assessed in "light of all the circumstances"). Without a doubt, a defendant who ambiguously mentions only that he would like his case to move along more promptly, and then spends the next few months dragging his feet as opposed to taking actions that indicate a desire for a speedy trial, has clearly not done enough to specifically invoke the Sixth Amendment's speedy trial protections. But a pro se defendant who makes a request that his case—after two years of unexplained delay—be put on a track toward trial, and then quickly follows that request up with a request for a preliminary hearing and a specific motion invoking the Sixth Amendment, has taken actions that result in the third factor weighing in his favor.

¶40    But more to the point, even if the dissent were correct that a defendant's invocation of the speedy trial right—in order to constitute action sufficient to tilt the third *Barker* factor in his favor—has to specifically mention a "trial," Hintze made precisely such an invocation here as soon as he was sure that there actually was going to be a trial. Recall that his first action—taken pro se—was to request counsel and a court hearing. His second action, after obtaining counsel, was to request a preliminary hearing, which of course is a proceeding designed to determine if the State's case is strong enough to bother staging a trial. It was not until the preliminary hearing was over with, and the court had bound Hintze over for trial on the pending charge, that the prospect of a trial became a reality. And Hintze's very next action in the case—taken just weeks after the bindover—was to file a motion specifically invoking his right to a speedy trial. Certainly, a defendant *could* invoke his or her right to a speedy trial even before a preliminary hearing is held. But it is not necessarily inconsistent with the exercise of the right to a speedy trial for a defendant to first seek a preliminary hearing to test whether there will even be a trial at all.

¶41    Ultimately, this third factor is not so much about the granular question—What precise language did the defendant use in invoking the right?—as it is about the overarching one: "whether the defendant's behavior during the course of the litigation evinces a desire to go to trial." *See United States v. Koerber*, 10 F.4th 1083, 1110 (10th Cir. 2021). Defendants who drag their feet and only half-heartedly express an interest in a speedy trial will have this factor weighed against them. On the other hand, defendants who do everything they could possibly do to "evince[] a desire to go to trial" will have this factor weighed in their favor. And given the facts of this case, the arrow on this factor's Weigh-O-Meter is flatlined toward Hintze's side.

¶42    Nothing about Hintze's course of action was dilatory; indeed, there is no hint of any effort on his part to delay these

proceedings or to drag his feet for a while before invoking his right to a speedy trial. From the moment he discovered the existence of this case, he tried to get the case moving toward trial, and from the moment he learned that there would actually be a trial he specifically invoked his right to have any such trial occur speedily. In our view, it is unreasonable to expect Hintze to have more emphatically or timely invoked his right to a speedy trial, and, under these circumstances, the third *Barker* factor weighs quite clearly in Hintze's favor.

D

¶43   The fourth and final *Barker* factor requires an examination of the extent to which Hintze was prejudiced by the State's delay in bringing the case toward trial. This factor—along with the second one, as noted above—is a crucial factor: although a "showing of prejudice may not be absolutely necessary in order to find a Sixth Amendment violation," courts "have great reluctance to find a speedy trial deprivation where there is no prejudice." *See United States v. Gould*, 672 F.3d 930, 939 (10th Cir. 2012) (quotation simplified).

¶44   In some cases, the length of delay is so egregious that prejudice is presumed to have occurred, and the defendant is relieved of any burden to demonstrate specific prejudice. *See Doggett*, 505 U.S. at 655 (recognizing that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify," and therefore concluding that "affirmative proof of particularized prejudice is not essential to every speedy trial claim"). When the delay stretches beyond four or five years, courts often presume prejudice. *See United States v. Serna-Villareal*, 352 F.3d 225, 232 (5th Cir. 2003) ("Indeed, this Court and others generally have found presumed prejudice only in cases in which the post-indictment delay lasted at least five years."); *see also Doggett*, 505 U.S. at 655, 657–58 (finding presumed prejudice where the delay amounted to

more than eight years, six of which were attributable to the government). Here, though, the two-year delay at issue is not long enough for us to simply presume that Hintze was prejudiced by the State's delay.

¶45 Accordingly, Hintze must demonstrate actual prejudice caused by the State's two-year delay in bringing this case to trial. "[U]nreasonable delay between formal accusation and trial" can cause "more than one type of harm." *See Doggett*, 505 U.S. at 654. Typically, courts list three types of harm that are commonly associated with delays in prosecution of a criminal case: "oppressive pretrial incarceration"; "anxiety and concern of the accused"; and impairment of the accused's defense, such as "dimming memories and loss of exculpatory evidence." *Id.* (quotation simplified). But courts have also recognized other related types of harm in this context, particularly in cases involving defendants who are already incarcerated on other charges. Indeed, the United States Supreme Court stated:

> At first blush it might appear that a man already in prison under a lawful sentence is hardly in a position to suffer from "undue and oppressive incarceration prior to trial." But the fact is that delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge. First, the possibility that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed. Secondly, under procedures now widely practiced, the duration of his present imprisonment may be increased, and the conditions under which he must serve his sentence greatly worsened, by the pendency of another criminal charge outstanding against him.

*Smith v. Hooey*, 393 U.S. 374, 378 (1969). And just a few years later, the Court noted that "no court should overlook the possible impact pending charges might have on [an incarcerated defendant's] prospects for parole and meaningful rehabilitation." *Moore v. Arizona*, 414 U.S. 25, 27 (1973); *see also Strunk v. United States*, 412 U.S. 434, 439 (1973) (noting that an already-incarcerated individual might sustain prejudice in the form of "uncertainties in the prospect . . . of receiving a sentence longer than, or consecutive to, the one he is presently serving," and that "other factors such as the prospect of rehabilitation may also be affected adversely").

¶46 Since then, many courts—for a variety of reasons—have found prejudice in cases involving already-incarcerated defendants. *See, e.g.*, *United States v. Seltzer*, 595 F.3d 1170, 1180 (10th Cir. 2010) (stating that the defendant was prejudiced by delay, because he "was denied the right to a bond hearing in state court" in another matter "and kept incarcerated" on that other matter "longer than might otherwise be necessary"); *Commonwealth v. Rodriguez*, 405 N.E.2d 124, 130 (Mass. 1980) (concluding that a defendant sustained *Barker* prejudice because the delay affected "his parole eligibility and [his] ineligibility for prison programs"); *State v. Chambers*, 2020 MT 271, ¶ 16, 474 P.3d 1268 (recognizing that the defendant "was eligible for parole" in another county on a different charge and that the charges at issue "affected his parole eligibility" in the other county and rendered him "not able to pursue a sentence that would run concurrently with" the sentence he was serving in the other county); *Turner v. State*, 545 S.W.2d 133, 139 (Tex. Crim. App. 1976) (concluding that a defendant had shown prejudice where "he was deprived of the possibility of receiving a sentence at least partially concurrent with his federal sentence" and where "the detainer that was placed on him . . . may well have prejudiced his opportunity for clemency, pardon, [or] parole").

¶47 Hintze does not claim that his ultimate defense to these charges was impaired by the State's delay in prosecuting the case.

Nor does he claim that he was made to suffer excessive pretrial incarceration *in this case*, because he was not being held on this charge. Instead, he asserts that the State's delay in prosecuting this case caused him to serve additional time behind bars by depriving him of the chance for either (a) parole in March 2020 in Case 3226, or (b) a chance to serve his sentence in this case concurrently with the sentence that had previously been imposed in Case 3226. We find Hintze's arguments persuasive.

¶48    In March 2018, at the time the charges were filed in this case, Hintze was incarcerated at the Utah State Prison. He had been sentenced to a zero-to-five-year term in August 2017 after he pled guilty to one count of attempted forcible sexual abuse, a third-degree felony. Hintze had one other previous offense—a 2011 class A misdemeanor conviction for attempted unlawful sexual activity with a minor. In March 2018—about a week before the charges were filed in this case, and when he had served just a few months of his prison sentence in Case 3226—he came up for a parole hearing but was not granted parole; the Board scheduled another parole hearing for March 2020, and told Hintze that he needed to complete sex offender treatment in the prison. By January 2020, Hintze had completed the required treatment, and presented himself to the Board once again in March 2020; at that point, Hintze had served more than two-and-a-half years of his maximum five-year sentence. But the Board again denied his request for parole, this time telling him that because he had an outstanding unresolved criminal case—this case—he would not be paroled, at least not until that case was resolved.

¶49    Hintze asserts that, if this case had been timely prosecuted in 2018, he would have been paroled in March 2020 in Case 3226. Stated another way, Hintze contends that, because of the State's delay in bringing this case, he ended up serving several additional months in jail—from March until at least the fall of 2020—in Case 3226. Hintze's argument certainly has strength, and requires us to examine more closely both (1) the hypothetical world that would

have existed had the State timely prosecuted this case, and (2) the precise level of causal link that is required for Hintze to demonstrate prejudice in this context.

1

¶50 To assess prejudice, we must ask ourselves whether the State's delay in prosecuting this case caused any harm to Hintze. And to meaningfully undertake that inquiry, we must compare what actually happened with what would have happened to Hintze had the State moved forward with the case in 2018. We acknowledge that engaging in this type of counterfactual hypothetical exercise necessarily entails some level of guesswork. But this seems definitionally bound up in any prejudice inquiry: after all, prejudice cannot be meaningfully assessed without some comparative examination of what *did* happen to Hintze and what we think *would have* happened to Hintze under hypothetical circumstances that did not actually come to pass. *See State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86 (declaring that "[p]rejudice analysis is counterfactual," and stating that such an analysis requires consideration of "a hypothetical—an alternative universe in which" the error or event in question did not occur).

¶51 Under the circumstances presented here, if the State had moved forward with prosecution of this case in a timely manner in 2018, Hintze would quite probably have spent less overall time incarcerated. There are several potential scenarios to consider.

¶52 First, we must consider the hypothetical world in which Hintze filed a motion to suppress in 2018—as he eventually did in 2020—and in which that motion was granted (as Judge Tenney believes it should have been, a conclusion with which we do not disagree). Had that occurred in 2018, the State would have had to decide whether to dismiss the case in the interests of justice, or to proceed to trial with limited evidence. If the State had decided to dismiss the case, or if Hintze had won an acquittal at a trial in

which the State could present only limited evidence, the previous existence of this case would not have negatively impacted Hintze's chances for parole in March 2020. Hintze testified, at the motion to dismiss hearing, that "what stopped [him] from being paroled" was the presence of this unresolved case. That testimony stands unrebutted on the record before us. Accordingly, we have no evidence-based reason to believe that, if this case had been resolved in Hintze's favor prior to March 2020, he would have been denied parole. Any contrary conclusion is based on extra-record speculation. If we limit our analysis to what appears in the record before us, we have no choice but to conclude that it is more likely than not that, had the thing that "stopped" Hintze "from being paroled" been removed from the equation, Hintze would have been paroled.

¶53    But even if we indulge in extra-record speculation—as is sometimes required by the nature of a prejudice inquiry—about what would have happened at the March 2020 parole hearing, it is clear that Hintze's request for parole would have been far from frivolous under the circumstances. Indeed, we think he would have been a good candidate for parole, based on what we know about this case. By March 2020, he had served over two-and-a-half years in prison, more than half of his maximum sentence. He had successfully completed sex offender treatment, as he had been asked to do at his last parole hearing. And he would have had no unresolved criminal cases. At that point, we can certainly envision corrections officials deciding to free up a bed at the prison by affording Hintze an opportunity to demonstrate, under supervision in the community, that he could use the tools he learned in his recent treatment program. Indeed, under those circumstances, we think it quite probable that Hintze would have been granted parole. It is, of course, possible to speculate otherwise. But we find it reasonably probable that, had this case been resolved in Hintze's favor in 2018, he would have been afforded the opportunity for parole in March 2020.

¶54    And that conclusion does not change even if we assume, for the purposes of the discussion, that the motion to suppress would have been denied in 2018 (as it was in reality). In that alternative scenario, it remains very likely that the case would have been resolved—likely through a plea—well prior to March 2020. And even if Hintze had pled guilty to (or been convicted of) the misdemeanor charge following the denial of his suppression motion, his overall time behind bars would likely not have been materially affected.

¶55    Let's start with the uncontroversial proposition that, if this case had been a standalone case involving a defendant who was not already incarcerated in another case, the defendant would likely have received a relatively light sentence. The crime, after all, involved a man sitting on a park bench with a teenage family friend; there were no allegations of other improper behavior. Recall that, in reality, the judge sentenced Hintze to no additional jail time, and simply closed the case. To be sure, the State indicated at sentencing that, "under normal circumstances," it would have asked for at least some "jail time" as opposed to simply closing the case. But in our standalone-case scenario, we do not find it likely that a judge would have ordered the defendant to spend more than thirty to sixty days behind bars.

¶56    Hintze's situation was different, of course, because he was already in prison on Case 3226. Because of that, a hypothetical 2018 sentencing judge might very well have decided to just sentence Hintze to the maximum indeterminate sentence—up to 365 days behind bars, to be served in the prison where Hintze was already being housed—and then asked the parties for input on whether the sentence should be imposed concurrently with, or consecutively to, the sentence Hintze was already serving in Case 3226. We know that the State would have asked for the sentence to "run consecutive" to the prison sentence Hintze was already serving. We imagine the defense would have asked for concurrent sentences. And we think, in all likelihood, the sentencing judge

would have imposed concurrent sentences. But ultimately, whether the judge imposed concurrent or consecutive sentences would not likely have mattered much to Hintze's overall time behind bars, because there is no indication either in the record before us or in our own understanding of the situation that the outcome of that sentencing conundrum would have had much effect on Hintze's parole eligibility.

¶57    As we understand it, had Hintze been ordered to serve a concurrent sentence, his presumptive total maximum prison sentence would have been increased by 36.5 days (10% of the shorter sentence), meaning that he would have been facing a prison sentence of zero-to-5.1 years (instead of zero-to-five years). *See Adult Sent'g & Release Guidelines* 26 (Utah Sent'g Comm'n 2021) (stating that, for concurrent sentences, "10% of the shorter sentence [will be] added to the full length of the longer sentence"). And had Hintze been ordered to serve consecutive sentences, his total maximum prison sentence would have been increased by 146 days (40% of the shorter sentence), meaning that he would have been facing a prison sentence of zero-to-5.4 years (instead of zero-to-five years). *See id.* (stating that, for consecutive sentences, "40% of the shorter sentence [will be] added to the full length of the longer sentence"). There is nothing in the record to indicate that these slight increases in Hintze's presumptive maximum sentence would have had any negative impact on Hintze's parole eligibility or the scheduling of parole hearings. In all likelihood, Hintze would still have been scheduled for a hearing in March 2020.

¶58    The question, then, is whether—in our hypothetical universe—Hintze would have been paroled at that hearing. We have already explained why we think Hintze would probably have been paroled in March 2020 if this case had been earlier resolved in his favor. And we do not think the outcome of that March 2020 parole hearing would have been any different if he had pled guilty to this misdemeanor count in 2018. He still would have been a good candidate for parole. He still would have

completed sex offender treatment and served roughly half of his maximum sentence. And he still would have been in a position where corrections officials would likely have wanted to see how he would perform under supervision in the community before their ability to supervise him expired.

¶59   As noted, one can certainly speculate in the opposite direction, as the dissent does. *See infra* ¶¶ 118–120. But our speculation is at least as solid as the dissent's; indeed, as we see it, it is at least reasonably probable that, under the specific circumstances presented here, Hintze would have been afforded the opportunity for parole in March 2020 if this case had been resolved in 2018. And since Hintze was not, in actuality, released from prison until at least the fall of 2020, Hintze has made a credible showing that he spent additional time behind bars as a result of the State's delay in prosecuting this case. Additional time spent incarcerated, if proven, counts as actual prejudice for purposes of the *Barker* analysis. *See Barker*, 407 U.S. at 532 (listing "oppressive pretrial incarceration" as one of the types of harm commonly associated with delays in bringing a case to trial).

2

¶60   We recognize, of course, that a defendant's right to a speedy trial is not violated if his claims of prejudice are "insubstantial, speculative, and premature." *See United States v. Ewell*, 383 U.S. 116, 122 (1966). In this vein, courts have emphasized that a defendant in this situation must demonstrate more than the "mere possibility" of prejudice. *See United States v. Vaughan*, 643 F. App'x 726, 732 (10th Cir. 2016) (stating that the "mere possibility of prejudice is not sufficient to support the position that . . . speedy trial rights were violated" (quotation simplified)); *see also United States v. Butner*, 350 F. Supp. 3d 1036, 1043 n.1 (D.N.M. 2018) (holding that the "mere possibility of a concurrent sentence is too speculative to constitute prejudice").

¶61 But while it is clear that a "mere possibility of prejudice" is too speculative, relatively little has been written with regard to what the actual causal standard is in this context. And there are several different possible causal standards. Some courts have held that defendants can demonstrate prejudice in this context if they can show a "reasonable possibility of prejudice," which is presumably a higher standard than a "mere" possibility of prejudice. *See Tribble v. United* States, 447 A.2d 766, 772 (D.C. 1982) (concluding that the defendant had failed to show a "reasonable possibility of prejudice" resulting from the delay); *State v. Campbell*, 662 P.2d 1149, 1155 (Idaho Ct. App. 1983) (requiring a defendant to "make a showing of reasonable possibility of prejudice"); *State v. Johnson*, 167 S.E.2d 274, 283 (N.C. 1969) (finding prejudice due to a "reasonable possibility of prejudice" because of the defendant's lost chances to seek concurrent sentencing and earlier parole); *State v. Ivory*, 564 P.2d 1039, 1044 (Or. 1977) (citing U.S. Supreme Court authority and deeming it "proper to adopt the rule" in which "the prejudice factor is met if the evidence taken as a whole shows some reasonable possibility of prejudice"); *see also Moore v. Arizona*, 414 U.S. 25, 27 (1973) (instructing courts not to "overlook the *possible* impact pending charges might have on [a defendant's] *prospects* for parole" (emphasis added)); *Woody v. United States*, 370 F.2d 214, 219 (D.C. Cir. 1966) (stating that the defendant must produce a "plausible" claim of prejudice to succeed in a speedy trial claim); *State v. Edwards*, 750 S.W.2d 438, 442 (Mo. 1988) (stating that the level of prejudice sufficient to "require reversal" in the speedy trial context is "actual prejudice apparent on the record or by reasonable inference—not speculative or possible prejudice" (quotation simplified)).

¶62 In other familiar contexts, including the Sixth Amendment context involving ineffective assistance of counsel claims, we require defendants to show a "reasonable probability of a different outcome." *See State v. Garcia*, 2017 UT 53, ¶¶ 36, 44, 424 P.3d 171 (stating that, in the ineffective assistance of counsel

context, a defendant must show "a reasonable probability of a different outcome" in order to demonstrate prejudice); *Tillman v. State*, 2005 UT 56, ¶ 29, 128 P.3d 1123 (stating that, in the context of a prosecutor's failure to disclose exculpatory material, a defendant, to demonstrate prejudice, must show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *see also State v. Richardson*, 2013 UT 50, ¶ 40, 308 P.3d 526 (stating that errors in interpreting rules of evidence require reversal when "there is a reasonable likelihood that the verdict would have been different" (quotation simplified)). The "reasonable probability" standard is of course more demanding than a "reasonable possibility" standard, but—at least in the prosecutorial disclosure context—it has sometimes been described as less demanding than the familiar "more likely than not" standard, *see Tillman*, 2005 UT 56, ¶ 29 n.7, which is of course another possible standard that could be applied in the *Barker* speedy trial context.

¶63     In our view, it makes the most sense to apply, in this context, the same standard that we apply in other similar contexts: the "reasonable probability" standard. Utah courts are familiar with that standard, and a robust body of case law exists setting out the contours of what a defendant must show to meet it.

¶64     Applied to the speedy trial context, this means that a defendant—in cases where the causal link for prejudice is at issue—must demonstrate at least a reasonable probability that he or she sustained actual prejudice as a result of the State's failure to prosecute the case in a timely manner. This standard can readily be applied to all types of *Barker* prejudice. *See Barker*, 407 U.S. at 532 (identifying three "interests of defendants" that "the speedy trial right was designed to protect": "oppressive pretrial incarceration," "anxiety and concern of the accused," and impairment of the defense's case). In an "impairment of defense" situation, for example, a defendant must not only show that a witness or other evidence has been rendered unavailable by the

State's delay, but also that the missing evidence would have been important enough to the trial to make a different outcome reasonably probable. In an "anxiety and concern" situation, defendants need to show more than simply that they suffered from anxiety; they need to show that it is reasonably probable that the anxiety was caused by the State's delay rather than by some other preexisting issue.

¶65　Similarly, as applied to a "pretrial incarceration" situation, defendants need to show that any claimed additional incarceration was causally linked to the State's delay. In the typical situation, in which a defendant is incarcerated on the case in question, the showing is often easily made (and may sometimes simply be assumed). But where a defendant is already incarcerated on another charge, it will usually be far from obvious that the defendant's incarceration is due to the State's delay in prosecuting the case in question rather than simply to the sentence the defendant was already serving; in such situations, defendants need to show a causal link between the State's delay and any claimed additional jail time. And defendants can make that showing by demonstrating that it is reasonably probable that any additional incarceration was due to the State's delay on the case in question rather than to another ground.

¶66　In this context, our supreme court has often stated that "a reasonable probability is a probability sufficient to undermine our confidence in the outcome." *See State v. Grunwald*, 2020 UT 40, ¶ 22, 478 P.3d 1 (quotation simplified). And in this case, our confidence in the outcome of the March 2020 parole proceeding— where the thing that "stopped" Hintze "from being paroled" was the existence of this outstanding case—is undermined. After considering everything we know about the situation, we find it at least reasonably probable that, had the State timely prosecuted this case in 2018 as it should have, Hintze would have been paroled in March 2020, and that therefore Hintze ended up serving additional time behind bars as a result of the State's

delay—time that he would not have served if the State had prosecuted this case promptly.

¶67    This is, of course, a conclusion based in part on educated guesswork. One can—and the dissent certainly has, *see infra* ¶¶ 108–120—certainly spin a scenario or two (also, of course, based on guesswork) in which that would not have been the case. And we recognize that sentencing judges and parole boards have wide discretion in imposing sentences and in granting parole. For precisely this reason, in many cases in which a defendant claims prejudice from something like a lost chance at parole or a concurrent sentence, the defendant's claims may be too speculative to credit. *See, e.g., United States v. Nixon*, 919 F.3d 1265, 1275 (10th Cir. 2019) (stating that the defendant's "theory of prejudice . . . rests on speculation"). But that does not mean that *all* such claims are too speculative to credit. In some cases—like this one—the claim will be sufficiently supported by the facts of the case, by reasonable inferences to be drawn therefrom, and by common experience, and will therefore rise above mere speculation. Indeed, on the facts presented here, we consider it more speculative to conclude that Hintze was *not* prejudiced than to conclude that he was. Stated another way, we consider it at least reasonably probable that Hintze sustained actual prejudice in the form of longer incarceration as the result of the State's delay. And this is sufficient. Accordingly, the important fourth *Barker* factor also weighs, at least to some extent, in Hintze's favor.

E

¶68    Our final task is to balance the four factors. But we need not linger very long at this task, because all four factors weigh in Hintze's favor. Under these circumstances, the *Barker* balancing test comes out quite clearly in Hintze's favor, and compels us to conclude that Hintze's constitutional right to a speedy trial was violated here.

¶69    As discussed above, in our view it is reasonably probable that Hintze sustained prejudice—additional incarceration—as a result of the State's delay in prosecuting this case. But even if the result of the prejudice analysis had been somewhat less clear, the balancing test would still have come out in Hintze's favor. The first three factors—including the important second factor regarding who is to blame for the delay—all weigh clearly in Hintze's favor. And where that is the case, Hintze should win the balancing test unless the prejudice analysis points convincingly toward an absence of prejudice. *See, e.g.*, *United States v. Brown*, 169 F.3d 344, 351 (6th Cir. 1999) (stating that the "amount of prejudice that the defendant must show depends on the reasons for the delay"); *United States v. Lonich*, 23 F.4th 881, 896–97 (9th Cir. 2022) (stating that the "amount of prejudice required to trigger a Speedy Trial Clause violation is inversely proportional to the length and reason for the delay" (quotation simplified)). Stated another way, given the fact that the first three *Barker* factors so clearly line up in Hintze's column, he should win the overall balancing test even if one were to conclude that the prejudice question was kind of a close one. *See Barker*, 407 U.S. at 533 (stating that "none of the four factors" are dispositive, and that courts should "engage in a difficult and sensitive balancing process . . . carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution"). As demonstrated by the amount of ink spilled on this issue in this opinion, the prejudice question here is at least that.

## CONCLUSION

¶70    Accordingly, we reverse the district court's order denying Hintze's motion to dismiss and remand this case with instructions for the district court to dismiss the charge.

———————

TENNEY, Judge (dissenting):

¶71     In the above opinion, the majority holds that Chad Hintze's Sixth Amendment right to a speedy trial was violated, thus necessitating the dismissal of the charge. I respectfully dissent from that decision. As I explain below in Part I, while the State admittedly took two years to prosecute Hintze, the delay was an inadvertent mistake (as opposed to being an act of intentional delay), the case was resolved within weeks of the time that Hintze first asserted his right to a speedy trial, and, most importantly, Hintze has not demonstrated that he suffered any actual prejudice from the delay. Under these circumstances, I don't believe that Hintze's constitutional right to a speedy trial was violated. I would therefore affirm the district court's denial of that motion.

¶72     Because I would affirm that denial, I would then reach the other issue that Hintze has raised on appeal: whether the district court should have granted his motion to suppress. On that, I agree with Hintze. As I explain in Part II, I believe that officers seized Hintze before they developed reasonable suspicion that any criminal activity was afoot. I would therefore reverse the district court on that basis and remand for further proceedings.

## I. Sixth Amendment Right to a Speedy Trial

¶73     The Sixth Amendment right to a speedy trial is "amorphous, slippery, and necessarily relative." *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (quotation simplified). When a defendant claims that his right to a speedy trial was violated, courts assess the claim by balancing four factors: (1) the "[l]ength of delay," (2) "the reason for the delay," (3) "the defendant's assertion of his right," and (4) whether the delay caused "prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

¶74    In Part I.A, I'll first discuss how I believe each factor should be assessed in this case. In Part I.B, I'll then discuss how I would balance the factors in this case. As explained there, I don't believe that Hintze's speedy trial right was violated under the circumstances of this case.

A.    The *Barker* factors

1.    Length of the delay

¶75    The first *Barker* factor looks at the length of the delay. "The length of the delay is to some extent a triggering mechanism. If the delay is not uncommonly long, the inquiry ends there." *State v. Younge*, 2013 UT 71, ¶ 18, 321 P.3d 1127 (quotation simplified). If it is, however, courts then consider all of the factors. *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). While the length of delay that will provoke a full "speedy-trial inquiry is necessarily dependent upon the peculiar circumstances of the case," "as a general matter, a delay approaching one year is enough to trigger a speedy-trial inquiry." *State v. Thompson-Jacobson*, 2022 UT App 29, ¶ 10, 508 P.3d 604 (quotation simplified).

¶76    Here, Hintze was charged in March 2018, and he pleaded guilty in September 2020. This was a delay of over two years, and it was therefore more than enough to trigger the full four-factor inquiry.

2.    Reason for the delay

¶77    The second *Barker* factor looks to "whether the government or the criminal defendant is more to blame for that delay." *Doggett*, 505 U.S. at 651. This court has previously explained that the reasons for delay can be classified as "deliberate, neutral, or valid." *Thompson-Jacobson*, 2022 UT App 29, ¶ 13; *accord Barker*, 407 U.S. at 531 (recognizing the "different weights" of various reasons for delay, including the "more neutral reason" of the State's "negligence or overcrowded courts"); *Younge*, 2013 UT 71, ¶ 19

(recognizing that "there are more neutral reasons for delay"). Although neutral reasons for delay are "weighted less heavily" than deliberate ones, they still weigh against the State because the "ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531; *see also Doggett*, 505 U.S. at 657.

¶78　Here, the prosecutor explained that there was "a mistake somewhere" that caused the delay. Hintze agreed with this characterization in his appellate brief, and he has never argued that the State made any deliberate effort to delay the case. Moreover, once this mistake was discovered, the case moved forward relatively quickly: Hintze learned of the outstanding charges in March 2020, he was appointed counsel in June 2020, the parties fully litigated two potentially dispositive defense motions in August and September 2020, and the case was resolved by way of a plea in September 2020.

¶79　Thus, this case falls under the neutral category of reasons for the delay. *See Thompson-Jacobson*, 2022 UT App 29, ¶ 13. So while this factor does weigh against the State, it does so less heavily than it would if there had been a showing of deliberate delay by the State.

3.　Assertion of the speedy trial right

¶80　The third factor considers the "defendant's assertion of his right" to a speedy trial. *Barker*, 407 U.S. at 530. Such an inquiry is appropriate because while the "primary burden" is "on the courts and the prosecutors to assure that cases are brought to trial," a defendant still "has some responsibility to assert a speedy trial claim." *Id.* at 529. And like the other *Barker* factors, this factor is analyzed in "light of all the circumstances." *Thompson-Jacobson*, 2022 UT App 29, ¶ 23.

¶81     This factor hasn't received much attention in past Utah appellate decisions. Other courts that have looked at it, however, have recognized (persuasively, I think) that this factor turns on whether and when "the government and the court were put on notice that a defendant has asserted his right to a speedy trial." *United States v. Black*, 918 F.3d 243, 263 (2d Cir. 2019) (quotation simplified); *accord United States v. Battis*, 589 F.3d 673, 681 (3d Cir. 2009) (focusing on whether the defendant made "a reasonable assertion of the right so as to put authorities on notice of his Sixth Amendment claim" (quotation simplified)); *State v. Buckner*, 738 S.E.2d 65, 72 (Ga. 2013) (holding that a defendant must "put the government on notice that he would prefer to be tried as soon as possible" (quotation simplified)).

¶82     It makes sense that this factor should turn on notice of this particular kind of request. Once the defendant informs the State that he is asserting his right to a speedy trial, the State knows that it must act expeditiously to bring the case to trial, lest it potentially be on the hook for a speedy trial violation. But in a similar vein, by making such a request, the defendant is also informing the court that he's desirous to move forward to trial, which then acts as something of an assurance that the defendant will now do his part to move the case toward a prompt and final resolution.[5]

---

5. This is why the analysis of the third *Barker* factor isn't limited to when the defendant asserted the right. Rather, it also takes into account "whether the defendant's behavior during the course of litigation" actually "evince[d] a desire" to "go to trial." *United States v. Koerber*, 10 F.4th 1083, 1110 (10th Cir. 2021) (quotation simplified); *see also Barker v. Wingo*, 407 U.S. 514, 521 (1972) ("Delay is not an uncommon defense tactic."). If a defendant has asserted his right to a speedy trial but then acts to delay that trial, he accordingly does not receive the benefit of this factor. *See, e.g., State v. Samora*, 2022 UT App 7, ¶ 29, 504 P.3d 195 (the third factor

(continued…)

¶83   But because this factor largely hinges on when the defendant provided the State and the court with such notice, the defendant's action must be sufficiently specific. In this sense, the defendant's "speedy-trial demand" should be "unambiguous." *Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013). Or, to put it differently, a "defendant invoking his speedy trial right must do so in a manner concretely enough to put the government on notice that he would prefer to be tried as soon as possible." *Labbee v. State*, 869 S.E.2d 520, 532 (Ga. Ct. App. 2022) (quotation simplified). And while this might not require the talismanic utterance of a particular phrase, "at the very least, a defendant should manifest his desire to be tried promptly." *United States v. Duran-Gomez*, 984 F.3d 366, 378 (5th Cir. 2020) (quotation simplified).

¶84   Our recent decision in in *State v. Thompson-Jacobson*, 2022 UT App 29, 508 P.3d 604, illustrates this. There, a pro se defendant wrote a letter to the court requesting "a motion to dismiss form, information about his case, and a list of all the criminal defense forms." *Id.* ¶ 5 (quotation simplified). A speedy trial issue later arose on appeal, and the inquiry partially turned on whether this letter qualified as an assertion of the speedy trial right. We "acknowledge[d] the difficulty faced by" a pro se defendant "in asserting his right to a speedy trial without the assistance of counsel." *Id.* ¶ 16. But even so, we concluded that "those

_____

did not weigh in the defendant's favor because "it was almost exclusively [the defendant] who delayed the trial"); *State v. Miller*, 747 P.2d 440, 443 (Utah Ct. App. 1987) (the delay was not "weighed heavily against the" State where the defendant's own "antics" caused delays in prosecution); *Koerber*, 10 F.4th at 1109–10 (the third factor "weigh[ed] heavily" against the defendant because, although he had asserted the right to a speedy trial, he then "requested several continuances and deadline extensions," behavior that was "hardly characteristic of a desire for a speedier process").

difficulties" did "not allow us to construe" the letter "as an assertion of a right that was neither mentioned nor alluded to." *Id.* We further held that it "would set poor precedent" to "imply that any ex-parte communication with the court" that merely "indicat[es] a desire to move forward with the prosecution" qualifies as an assertion of the right to a speedy trial. *Id.* (quotation simplified).

¶85　I believe that the same core defect exists here too. Hintze asks us to construe his March 2020 letter as an assertion of his right to a speedy trial. In that letter, Hintze provided the district court with his identifying information, his location in jail, and the case number for the pending charge in this case. Hintze also asked the court to appoint him an attorney, and he further said that he "would like to set up video court." But Hintze did not request a trial, let alone a speedy trial, nor did he cite or somehow invoke the Sixth Amendment. Because of this, I don't see anything in this letter that would have put the State and the court on notice that Hintze was invoking this specific right, as opposed to making a request to, in the words of *Thompson-Jacobson*, "move forward with the prosecution" in some undefined or more general way. *Id.* (quotation simplified).

¶86　The majority holds otherwise, choosing to "[r]ead" the letter "liberally" and concluding that Hintze was asking the court "to get his case moving *toward resolution*, through *trial* or otherwise." *Supra* ¶ 36 (emphases added); *see also supra* ¶ 38 (construing the letter as evincing "a desire to get the case *moving toward trial*" (emphasis added)). But Hintze never said anything in that letter about requesting a "trial," let alone a speedy one, nor did he say anything about being ready or willing to promptly "resolve" the case as a whole. All that Hintze said was that he wanted "counsel" and "video court."

¶87　I'm cognizant of the fact that Hintze was pro se at this point. But even so, I just don't know what Hintze meant by "video

court." Since nothing had yet happened in the case, and since Hintze was requesting counsel in that same paragraph, I think the most natural reading is that he was asking for something akin to a scheduling conference or even an initial appearance (which, after all, is where courts would typically appoint counsel). To be fair, maybe he did mean to ask for something more. But if he did, he certainly didn't say what, exactly, it was that he was asking for.

¶88    This is why I part ways with the majority about how to assess Hintze's letter. The majority places great emphasis on its view that by requesting "counsel" and "video court," Hintze "was trying to accelerate" the case. *Supra* ¶ 36. And when discussing what Hintze did after writing this letter, the majority makes much of the fact that Hintze requested a preliminary hearing a short time later. *See supra* ¶ 40.

¶89    But a criminal case has many steps, and for case-specific or idiosyncratic reasons, a particular defendant might want to "accelerate" the case and get to or through some of the case's earlier steps without ever wanting to get to the final step of a trial, let alone speedily. A previously unrepresented defendant might want a hearing so that the court can appoint counsel, and he might want counsel even if he has no desire to ever go to trial. He might also want a preliminary hearing in the hopes that the court will dismiss the charges, thereby sparing him the prospect of going to trial; and even if he suspects that some of the charges will survive the preliminary hearing, he might still want that preliminary hearing because of the potential strategic benefits that would come from testing the State's case or from whittling down the number of pending charges. And a defendant might also want to file motions for reasons that have nothing to do with moving forward to trial. The Tenth Circuit's recent decision in *United States v. Koerber*, 10 F.4th 1083, 1009 (10th Cir. 2021), provides an example of this, where the defendant filed numerous and lengthy motions in support of his effort to "intentionally delay[] his case." (Quotation simplified.)

¶90   But *Barker*'s third factor doesn't turn on the defendant's mere participation in the pretrial process. *Barker* was much more specific: the Court directed courts to consider the "defendant's assertion of his speedy trial right." 407 U.S. at 531. This is a particular right that has a particular source and a particular meaning, and I think that *Barker* meant what it said. So to gain the benefit of this factor, I believe that a defendant must do something that puts the court and the State "on notice that he would prefer to be *tried* as soon as possible." *Labbee*, 869 S.E.2d at 532 (emphasis added). While I respect where my colleagues are coming from, I don't believe that requests for "counsel" or "video court" or even a preliminary hearing (which is, of course, a decidedly different thing than a trial) are individually or collectively the same as a request for a speedy trial.

¶91   By treating these as being the functional equivalent anyway, I'm worried that the majority risks watering this factor down so much that it will lose its intended and independent meaning. In *District of Columbia v. Cruz*, 828 A.2d 181 (D.C. 2003), the D.C. Court of Appeals expressed a similar concern in a slightly different context. There, local defense attorneys had a practice of "generally assert[ing] the constitutional rights of defendants at arraignment hearings," and the issue on appeal was whether such an assertion qualified as an assertion of the right to a speedy trial for purposes of the *Barker* test. *Id.* at 183. The court of appeals held that it didn't, explaining that "if such a generalized assertion of all constitutional rights were sufficient, this prong of the test would be meaningless." *Id.* The court instead insisted that, for purposes of this factor, "a defendant must make a specific assertion of a speedy trial violation." *Id.* Like the D.C. Court of Appeals, I would require something more specific too.

¶92   In my view, Hintze didn't invoke the right until August 2020, which was when he filed his motion to dismiss based on the State's alleged failure to speedily try him. I believe that we should

therefore regard August 2020, not March 2020, as the operative date for purposes of the third *Barker* factor.

¶93 This leaves the final question, which is how to assess this factor. As an initial matter, and at the risk of stating what should be obvious, I don't believe that we can hold it against Hintze that he didn't assert the speedy trial right from the filing of the charge in March 2018 until March 2020, given that Hintze didn't yet know about the charge during that entire period. *See generally Thompson-Jacobson*, 2022 UT App 29, ¶ 23 (holding that this factor is analyzed in "light of all the circumstances"). I also don't believe that Hintze's failure to assert the right from March 2020 to June 2020 should be counted against him, and this is so because he didn't yet have counsel. *See Barker*, 404 U.S. at 529 (recognizing a difference between a defendant who "knowingly fails to object" on speedy-trial grounds and "a situation in which no counsel is appointed").

¶94 What we're left with, then, is this: Hintze's counsel was appointed in June 2020, and he asserted the right in August 2020. I agree that this was a relatively prompt assertion of the right. For reasons I discuss more fully below in Part I.B, however, I don't believe that, under the particular circumstances of this case, this factor ultimately compels us to conclude that Hintze's speedy trial right was violated.

4.    Prejudice

¶95 The fourth *Barker* factor looks at whether there was "prejudice to the defendant." *Barker*, 407 U.S. at 530.

¶96 For this factor to weigh in favor of the defendant, the defendant must make a "persuasive allegation that prejudice resulted from the delay." *State v. Stilling*, 770 P.2d 137, 143 (Utah 1989). As explained by the Supreme Court, the mere "possibility of prejudice" is generally insufficient. *United States v. Loud Hawk*,

474 U.S. 302, 315 (1986); *accord Jackson v. Ray*, 390 F.3d 1254, 1264 (10th Cir. 2004). In *State v. Mejia*, 2007 UT App 337, ¶ 14, 172 P.3d 315, we therefore faulted the defendant for providing "no factual support" for his prejudice argument. And in a string of cases, the Tenth Circuit has likewise held that a defendant must "show definite and not speculative prejudice" to gain the benefit of this factor. *See, e.g., Koerber*, 10 F.4th at 1110; *United States v. Medina*, 918 F.3d 774, 782 (10th Cir. 2019); *United States v. Madden*, 682 F.3d 920, 929 (10th Cir. 2012).

¶97    It's therefore understood that in most cases, the defendant must show actual prejudice to gain the benefit of this factor. But there's an exception to that requirement: namely, in cases of "excessive delay," some forms of prejudice can be presumed. *Doggett*, 505 U.S. at 655; *see also Thompson-Jacobson*, 2022 UT App 29, ¶¶ 21–22. I don't see any authority suggesting that a two-year delay qualifies as "excessive" for purposes of this inquiry, however, so I don't believe that Hintze is entitled to the presumption of prejudice. As a result, to claim the benefit of this factor, Hintze must demonstrate that this delay actually prejudiced him.

¶98    When assessing claims of speedy trial prejudice, courts commonly look to the three interests that the right was "designed to protect." *Barker*, 407 U.S. at 532. These interests are: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern in the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.*; *see also Thompson-Jacobson*, 2022 UT App 29, ¶ 18. "Of these, the most serious is the last." *State v. Cornejo*, 2006 UT App 215, ¶ 33, 138 P.3d 97 (quotation simplified).

¶99    In this case, Hintze doesn't argue that his defense was "impaired" by the delay. To the contrary, he acknowledges in his brief that he is *not* making such an argument. He has therefore

conceded "the most serious" of the interests that are typically at issue in a speedy trial prejudice analysis. *Id.*[6]

¶100 Hintze instead focuses on the two other protectible interests, arguing that the delay in prosecuting him caused both "oppressive pretrial incarceration" and unwarranted "anxiety." But under the unique circumstances of this case, Hintze faces a daunting hurdle: during the entire period in which this case was pending, Hintze was incarcerated because of his unrelated conviction in Case 3226.

¶101 This must matter. After all, if a defendant "was incarcerated for a separate offense during the delay," "as a practical matter," his existing incarceration will typically impair his ability to show that a delay in prosecuting him for another offense was the actual source of any "oppressive pretrial incarceration" or anxiety based on his incarceration. *West v. Symdon*, 689 F.3d 749, 753 (7th Cir. 2012). So here, while there was indeed a two-year delay in bringing Hintze to trial in this case, Hintze still needs to show how *this* delay (as opposed to the effects of his incarceration in the unrelated Case 3226) actually caused him any oppressive incarceration or anxiety. And on the anxiety front, Hintze's burden is further complicated by his own admission that he didn't even know about this charge until March 2020. Having had no knowledge about this case until then, Hintze could not have suffered any anxiety from this case until, at the very earliest, March 2020.

---

6. I acknowledge that there might be some circumstances in which an already-incarcerated defendant might be able to make an impairment-of-defense claim (such as when he can show that there was a loss of evidence in the meantime). But as noted, Hintze makes no such claim here, instead relying on the fact of incarceration itself and the associated anxiety.

¶102   In light of this, Hintze's prejudice argument turns on his assertion that if this case had been resolved more speedily, he would have been released from prison in Case 3226 in March 2020 and that those extra months of incarceration (i.e., the months of incarceration between March and September 2020) are sufficient to show *Barker* prejudice. The majority accepts this assertion based on two principal conclusions: (1) its belief that, "in all likelihood, the sentencing judge" in this case "would have imposed concurrent sentences" with the sentence previously imposed in Case 3226 and (2) its belief that, even if the sentences had run consecutively, it's still "likely" that Hintze would have been paroled in Case 3226 sometime sooner than he actually was. *Supra* ¶ 56. I believe that the majority is mistaken on both conclusions, and this is so for both general and case-specific reasons.[7]

---

7. The majority briefly sets forth a third possibility: namely, that based on my analysis of why the motion to suppress should have been granted (an analysis that the majority does "not disagree" with), that motion might have been granted in 2018, thus leading to either a non-prosecution or an acquittal, thereby removing this case as an impediment to Hintze being paroled in March 2020. *Supra* ¶ 52.

   Unlike the majority, however, I don't believe that we can rewind the clock and act as if the district court would have seen the light on the suppression issue in the first instance. It seems to me that, for purposes of a speedy trial analysis, we should assume that the district court would have acted as it did originally, meaning that Hintze would have prevailed on the suppression issue only following an appeal of the denial of his motion to suppress.

   In any event, I'm also not convinced that granting the suppression motion necessarily does weaken the State's case in an outcome-determinative way. Hintze's motion sought to suppress his statement to the first officer about his name. But while that

(continued…)

¶103   First, the general reasons. On the concurrent/consecutive component of this, the majority points to a pre-*Barker* decision from 1969 in which, in a single sentence, the Supreme Court opined that the "possibility" that an incarcerated defendant might have lost the chance to receive a concurrent sentence in some other case might be enough to establish speedy trial prejudice. *Supra* ¶ 45. And on the broader loss-of-parole-possibility component, the majority points to a few cases suggesting that such a loss might be enough too. *Supra* ¶¶ 44–45.

¶104   But the Supreme Court has more recently stated that the mere "possibility of prejudice is not sufficient" to carry the defendant's burden on the fourth *Barker* factor. *Loud Hawk*, 474 U.S. at 315. Given that statement, I think we should be very wary of concluding that a defendant has established *Barker* prejudice based on our speculation about how a purely discretionary sentencing decision might have played out in a hypothetical counterfactual world where the defendant had been more speedily prosecuted. In such a scenario, the number of uncertain variables in play, particularly with respect to the predicate sentencing decision itself, makes the situation an ill fit for a subsequent judicial determination that *Barker* prejudice (which,

---

conversation was occurring, a separate officer spoke to the teenager and then to her mother, and during the conversation with the mother, that officer also learned Hintze's name. Hintze has not sought to suppress the information obtained from the mother (and if he did, he'd need to establish, among others, that he has standing to make such a challenge). But if that information stays in, the State could still identify Hintze as a sex offender who was not legally permitted to be in the park. For this additional reason, I don't believe that our apparently shared view on the proper resolution of Hintze's suppression motion provides a basis for concluding that Hintze suffered *Barker* prejudice.

again, turns a showing of "actual prejudice") has actually been established.

¶105 Numerous cases have expressed such wariness. In *United States v. Nixon*, 919 F.3d 1265, 1275 (10th Cir. 2019), for example, the Tenth Circuit recently considered a case in which the defendant claimed that a delay in prosecuting him had prejudiced him by impairing his ability to earn "good-time credits," which could have then supported his earlier release from federal prison. But the Tenth Circuit explained that it was uncertain whether the defendant actually would have behaved well in prison in a hypothetical world in which the case had been resolved more quickly, and it also pointed out that even if he had, "prison officials" still "enjoy[ed] discretion as to whether to award good-time credits." *Id.* Because of "the uncertainties of how [the defendant] would behave" and of "how authorities would exercise their discretion," the Tenth Circuit concluded that the defendant's "theory of prejudice rest[ed] inherently on speculation." *Id.* Because of this, the court held that these speculative possibilities could not establish prejudice on a speedy trial claim. *Id.* at 1275–76.

¶106 The Tenth Circuit's reticence has been shared by a wide array of courts, with courts commonly concluding that a defendant did not establish *Barker* prejudice by speculating that a discretionary sentencing decision might have gone differently in a hypothetical world in which the prosecution at issue proceeded more quickly. *See, e.g., United States v. Gonzalez-Avina*, 234 F. App'x 758, 760 (9th Cir. 2007) (rejecting a claim that the delay in federal prosecution impaired the defendant's ability to receive state "good time credits," thereby violating the defendant's speedy trial right, reasoning that "the possibility that [the defendant] would have served a shorter sentence absent the pending federal complaint is speculative at best, and will not support a finding of a Sixth Amendment violation"); *United States v. Butner*, 350 F. Supp. 3d 1036, 1043 n.1 (D.N.M. 2018) (rejecting a

claim that the delay prevented the defendant from receiving concurrent sentences, noting that a "defendant does not have a right to serve his sentences concurrently" and that the "Tenth Circuit has made clear . . . that the mere possibility of a concurrent sentence is too speculative to constitute prejudice"); *United States v. Lainez-Leiva*, 957 F. Supp. 390, 392 (N.D.N.Y. 1997) (rejecting a concurrent-sentences based prejudice claim "because the Defendant's criminal history, consisting of four convictions for criminal possession of a weapon, makes the likelihood of the Defendant obtaining a concurrent sentence highly speculative"); *Wilson v. State*, 329 So. 3d 71, 83–84 (Ala. Crim. App. 2020) (rejecting a concurrent-sentences-based prejudice claim as "speculative" because there was "no guarantee that the circuit court would have ordered" the sentences to run concurrently); *Matthews v. State*, 325 A.2d 897, 901–02 (Md. Ct. Spec. App. 1974) (rejecting the defendant's argument that she was prejudiced because "she was denied the possibility of parole because of the pending charges" because there was "nothing in the record to demonstrate that [she] would have been paroled even if the instant case had not been pending"); *Commonwealth v. Anderson*, 378 N.E.2d 451, 498 (Mass. App. Ct. 1978) (holding that the defendant failed to show prejudice because the "possibilities that the outstanding charges may have prevented him from obtaining parole or concurrent sentences [were] speculative and unsupported by the evidence"); *Commonwealth v. Campbell*, 366 N.E.2d 44, 55 (Mass. App. Ct. 1977) (rejecting a defendant's claim that the delay prevented her from being paroled because the claim was "unsupported by evidence or affidavit in the record, [and] must be treated as speculative"); *State v. Irish*, 140 N.E.3d 209, 227 (Ohio Ct. App. 2019) (rejecting the defendant's claim that "he was prejudiced by the delay because he could have requested a sentence concurrent to what he was already serving," because "the theoretical and speculative loss of the opportunity for a defendant to serve the sentence on the pending charge concurrently with the sentence in another case is insufficient to

constitute substantial prejudice to the defendant" (quotation simplified)).

¶107 Both of the decisions that are driving the majority's conclusion are entirely discretionary. The concurrent/consecutive decision is discretionary with the district court. *See, e.g., State v. Samul*, 2015 UT App 23, ¶ 21, 343 P.3d 719. And on the parole decision, the Board has "unfettered discretion . . . to fix the term of imprisonment" after a defendant has been sentenced by the district court. *Neese v. Utah Board of Pardons & Parole*, 2017 UT 89, ¶ 23, 416 P.3d 663 (quotation simplified). Given the purely discretionary nature of both decisions, I would require Hintze to point to something much more definitive before concluding that he has carried his burden of establishing *Barker* prejudice. In my view, his prejudice claim fails for this reason alone.

¶108 Second, even if such discretionary questions could lead to a prejudice determination in some cases, I don't believe that Hintze has shown prejudice on the record before us. Indeed, there's good reason from this record to believe that both decisions would have gone against Hintze if this case had been more promptly resolved.

¶109 Let's start with the concurrent/consecutive question. Again, the majority thinks that "in all likelihood, the sentencing judge would have imposed concurrent sentences" in this case if it had been prosecuted more quickly. *Supra* ¶ 56. I'm not sure why this is so.

¶110 In her argument at sentencing, the prosecutor told the court that if this case had not been delayed, she would have asked the court to impose a "consecutive" term of incarceration on Hintze. She said that the reason for this request would have been that as a twice-convicted sex offender, Hintze had now also been convicted of being in a public park with a teenage girl, an offense for which she believed Hintze should receive "some additional

punishment." But even so, she then agreed that Hintze should not receive any "additional time" in this case—but only because the case had "been pending for two years" and Hintze had been "in prison anyway." After hearing arguments from defense counsel, the court then agreed to impose no additional jail time on Hintze for this offense. And in doing so, the reason it gave was its "concern[] about the failure to prosecute and move the case forward."

¶111   Thus, on this record, we have a direct statement from the prosecutor that she would have asked for consecutive sentences if there had been no delay (coupled with cognizable reasons for that request), as well as a statement from the court in which the only reason it gave for not imposing any additional period of incarceration was the delay. So in a hypothetical world where that delay was removed, the only thing this record tells us is that Hintze was likely on track to receive consecutive sentences, not concurrent sentences. There's no basis in this record for concluding otherwise.

¶112   Accounting for this, the majority surmises that this "would not likely have mattered much" in the end given the vagaries of the sentencing guidelines and the parole decision, *supra* ¶ 56, which leads to the real focus of its analysis: the question of what the Board would have done with Hintze's incarceration in Case 3226 if this case had been resolved sooner. After all, his conviction in this case was for a class A misdemeanor (subject to up to one year of jail), while the conviction in Case 3226 was for a third-degree felony (subject to 0–5 years in prison).

¶113   The record shows that in March 2018, the Board scheduled a parole hearing for March 2020, with Hintze being instructed that he needed to complete a sex offender training program "before being considered for parole." The record further shows that Hintze completed his sex offender training program in January 2020. The record then shows that the Board decided at the March

2020 hearing not to release Hintze in Case 3226. Of some potential note, Hintze later testified at the suppression hearing in this case. When asked "what stopped [him] from being paroled" in March 2020, Hintze responded: "A warrant was filed that needed to be adjudicated, this current one." All parties agree that this was a reference to the charge in this case.

¶114   In his brief, Hintze initially claims that this means "that he suffered a delay in parole *eligibility* as a result of this case." (Emphasis added.) The majority seems to accept this framing, relying on cases in which the defendant's parole eligibility was compromised by the delayed case, *supra* ¶ 46, and then analyzing the impact of the case at issue in this appeal on "Hintze's parole eligibility," *supra* ¶¶ 56–57.

¶115   But Hintze points to nothing in the record showing that the Board thought that Hintze wasn't "eligible" for parole in March 2020. Instead, Hintze only points to the fact that he was denied parole in March 2020. The fact that he was denied parole, however, doesn't mean that the Board thought that Hintze was ineligible. It could just as readily mean that the Board thought he was eligible, considered him for parole at that hearing, and then chose not to parole him as an exercise of its "unfettered discretion." *Neese*, 2017 UT 89, ¶ 23 (quotation simplified). I see nothing in the record that says otherwise.

¶116   This leaves Hintze's testimony that what "stopped" him from being paroled in March 2020 was that this case "needed to be adjudicated." Based on this testimony, the majority concludes that it's "at least reasonably probable that, had the State timely prosecuted this case in 2018 as it should have, Hintze would have been paroled in March 2020." *Supra* ¶ 66. But I think there's a critical flaw in this conclusion: namely, it rests on the assumption that the only thing the Board cared about when it was informed of this case was that the case was *pending*, as opposed to the Board

also believing that the *outcome* of this case might matter to its determination of when Hintze should be released.

¶117 Even in the cited passage of testimony, Hintze didn't directly say the outcome of this case didn't matter to the Board. (Nor, for that matter, did he call anyone else who had direct knowledge to testify about this either.) I think this assertion thus fails for lack of proof. In any event, I also find the majority's speculative conclusion about how it thinks this would have played out to be difficult to accept. Based on Hintze's criminal record that included the 2011 conviction and the 2017 conviction in Case 3226, the Board was willing to have a parole hearing for Hintze in March 2020. But in the hypothetical scenario in which we're now dwelling—one that adds a conviction in this case to that same mix—here's what the Board would have been confronted with:

- In 2011, Hintze was convicted of attempted unlawful sexual activity with a minor, a class A misdemeanor.

- Based on the June 2016 park incident at issue in this case, Hintze was convicted of unlawfully going to a public park, and the uncontestable facts show that he did so with a young teenage girl. And since the Board would have had the authority to look at the facts of record, I think it's worth noting that although the teenager's mother confirmed for officers that Hintze was indeed a family friend, she also told officers that Hintze had neglected to tell her that he was a convicted sex offender. I think it's fair to surmise that some parents and some Board members might think this was a curious omission.

- In 2017, Hintze was convicted in Case 3226 for attempted forcible sexual abuse, a third-degree felony. In the State's opposition to Hintze's speedy trial motion in this case, the State informed the court that this 2017 conviction was

based on an incident in "approximately 2014–2015," wherein Hintze "walked in on a 14-year-old girl who was in the shower," "touched the outside of her vagina," and "told her she needed to shave." Hintze never disputed the characterization of the facts that supported that conviction.[8]

¶118 Again, even under the majority's construct, the initial question is whether Hintze has established that the Board would have released him in March 2020 (rather than delaying things for six months like it actually did) if the conviction in this case had been entered before March 2020. Unlike the majority, I don't believe that this is likely. After all, in the real-world version, it looked to the Board like Hintze committed one sex offense in 2011

---

8. Because Hintze did not dispute this characterization, I think we're safe relying on it here. Regardless, in the sworn plea statement in that case (case no. 171903226), Hintze admitted that he had "entered a bathroom where the victim was showering," "turned off the lights," "opened the shower curtain," and then "touched the victim on the outside of her vagina with his hand." He further admitted that this "touching was not consensual." The Board would certainly have had access to this document.

In any event, under rule 201(b)(2) of the Utah Rules of Evidence, we may also take judicial notice of a fact that "is not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Utah R. Evid. 201(b)(2). We have previously suggested (without deciding) that a court can take "judicial notice that court filings contained certain allegations, or that findings of fact were made by another court," though we posited that it might cross the line for a court to take judicial notice that the facts from the prior case were actually true. *State v. Cooper*, 2011 UT App 412, ¶ 15 n.8, 275 P.3d 250. Here, I believe that we can, at minimum, take judicial notice that Hintze previously admitted to these particular facts under oath when entering his plea in Case 3226.

followed by another offense in 2014 or 2015—two offenses separated by a gap of a few years. But adding this conviction to the mix would have shown the Board that after committing a sex offense involving a teenage girl in 2011, and after then walking in on a showering 14-year-old girl and touching her vagina in 2014 or 2015, Hintze violated the terms of his sex offender status in June 2016 by going to a public park (and, of note, with yet another teenage girl). These are three offenses involving three teenage girls within a five-year period.

¶119 "Once is an accident, twice is a coincidence, three times is a pattern." *League of Women Voters of Fla., Inc. v. Lee*, 2022 WL 969538, at *26 (N.D. Fla. Mar. 31, 2022). Here, nothing suggests that Hintze's first offense was an accident. And more to the point, adding this conviction and these additional details to Hintze's first and second offenses now makes it seem like Hintze has a pattern of engaging in criminal conduct that involves teenage girls. And that pattern, I believe, would have been even clearer to the Board if this case had been resolved before Hintze's March 2020 parole hearing. So if the question before us is whether, in the hypothetical world in which the Board had three convictions to consider in March 2020, the Board would have been more lenient toward Hintze than it was in the real world in which the third case was simply unresolved in March 2020, I think the most likely answer to that question is no.[9]

---

9. In speculating otherwise, the majority relies, in part, on the sentencing guidelines, noting that if the sentences had been ordered to run consecutively, the guidelines would recommend an additional 146 days of incarceration for this offense. *Supra* ¶ 57. But Utah's sentencing guidelines "do not create any right or expectation on behalf of any individual," and their recommendations are "advisory only" and "not mandatory." *Adult Sent'g & Release Guidelines* 5, 77 (Utah Sent'g Comm'n 2021).

(continued…)

¶120 I recognize that I might be wrong about this and that it's possible that the Board would have gone the way the majority thinks it would have gone. As noted by the majority, we're both indulging in some "guesswork" here.

¶121 But in my view, the fact that we're both engaged in guesswork is the very reason that Hintze's prejudice argument fails. This is Hintze's motion, and because of that, he bears the burden of establishing that he suffered actual prejudice from the delay in prosecuting him for the June 2016 park offense. With respect, I believe that there's just too much *maybe* at the heart of the majority's conclusion that Hintze was prejudiced. Maybe the district court would have granted the motion to suppress in 2018, or maybe it would have ordered concurrent sentences, or maybe the Board would have let Hintze out of prison in Case 3226 in March 2020 even if it now had a third conviction to consider. Maybe.

¶122 But again, the Supreme Court has instructed that the mere "possibility of prejudice is not sufficient" to establish prejudice. *Loud Hawk*, 474 U.S. at 315. There's simply nothing concrete in this record that establishes that Hintze would have been released any sooner but for the delay, so his claim of prejudice must necessarily turn on the "possibility" that he might have been prejudiced. I would therefore reject his prejudice claim for failure of proof alone; if pressed, however, I would also reject it because I believe that it's more likely that Hintze would have remained

While they "create a starting point" for decision making, the Board can still consider other "aggravating and mitigating circumstances" before reaching its final decision. *Id.* at 6. For the reasons discussed, I think this is all too speculative to establish *Barker* prejudice, and in any event, I think the aggravating circumstances here—a pattern of criminal conduct involving teenage girls—suggest that the Board would likely have looked on a request for earlier release with some disfavor.

incarcerated for the same period of time anyway. As a result, I believe that this factor must weigh against Hintze in the speedy trial analysis.[10]

---

10. The majority notes that "relatively little has been written with regard to what the actual causal standard is" for proving *Barker* prejudice. *Supra* ¶ 61. After noting the existence of "several different possible causal standards" among the cases, the majority adopts a "reasonable probability" standard that is similar, in its view, to the causal standard for prejudice that is employed in ineffective assistance cases. *Supra* ¶ 63.

Of the possibilities in play, I note that some jurisdictions hold that the quantum of proof for *Barker* prejudice varies depending on how the other *Barker* factors are resolved. *See, e.g., United States v. Brown*, 169 F.3d 344, 351 (6th Cir. 1999) (the "amount of prejudice that the defendant must show depends on the reasons for the delay"); *United States v. Lonich*, 23 F.4th 881, 896–97 (9th Cir. 2022) (the "amount of prejudice required to trigger a Speedy Trial Clause violation is inversely proportional to the length and reason for the delay" (quotation simplified)); *Ussery v. State*, 596 S.W.3d 277, 283 (Tex. App. 2019) (the "accused's burden of proof" in "showing prejudice varies inversely with the State's degree of culpability for the delay" (quotation simplified)). But I don't believe it's necessary to definitively decide whether this or any other identified causal standard should be adopted here, however, because I don't believe that Hintze has shown prejudice under any of the identified standards.

Regardless, even accepting the majority's "reasonable probability standard," I note that in the analogous (and similarly worded) ineffective assistance context, it's true that a "reasonable probability" is enough to establish prejudice, but even so, there must still be a concrete factual underpinning for any conclusion that there was prejudice. In this sense, the "demonstration of

(continued…)

B. Balancing the factors

¶123   This leads to the final task, which is to determine whether Hintze's right to a speedy trial was violated. Again, the "speedy-trial right is amorphous, slippery, and necessarily relative." *Brillon*, 556 U.S. at 89 (quotation simplified). And it also "take[s] into account" both the "defendant's rights" and "the rights of public justice." *State v. Samora*, 2022 UT App 7, ¶ 18, 504 P.3d 195 (quotation simplified).

¶124   As discussed, courts determine whether the right was violated through *Barker's* "four-factor balancing test." *Younge*, 2013 UT 71, ¶ 17 (quotation simplified). But unlike some balancing tests, this is not a discretionary balancing in which appellate courts defer to the district court. Rather, this task presents a legal question. *See State v. Steele*, 2010 UT App 185, ¶ 14, 236 P.3d 161. As a result, it's up to the reviewing courts to decide through some sort of legal alchemy whether the particular mix of factors in a particular case constituted a Sixth Amendment violation.

¶125   There's some inherent imprecision associated with this task. And this imprecision is a product, in part, of the interrelated nature of the four factors. *Barker* cautioned that "none of the four factors" should be regarded as "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy

---

prejudice must be a 'demonstrable reality'" and "not simply a 'speculative matter.'" *Ross v. State*, 2019 UT 48, ¶ 111, 448 P.3d 1203 (quoting *State v. Chacon*, 962 P.2d 48, 50 (Utah 1998)). As explained above, I believe that Hintze's prejudice claim runs far afield of any demonstrable facts and is instead impermissibly speculative. Thus, even under the causal approach adopted by the majority, I don't believe that there is a reasonable probability that Hintze would have been released earlier without this delay in prosecution.

trial." 407 U.S. at 533. And it further explained that the factors are "related" and "must be considered together with such other circumstances as may be relevant." *Id.*

¶126 But even so, it often turns out that some factors favor the defendant in a case while others favor the government. Because of this, courts in such cases must somehow decide which factor(s) matter most.

¶127 There's been some inconsistency in the caselaw about how to assess this. As noted by the majority, for example, the Supreme Court in one case suggested that the "reason for delay" (the second factor) is the "flag all litigants seek to capture." *Loud Hawk*, 474 U.S. at 315 (1986). And with respect to prejudice (the fourth factor), the Court has called it a "fundamental error" to require "an affirmative demonstration of prejudice" to "prove a denial of the constitutional right to a speedy trial." *Moore v. Arizona*, 414 U.S. 25, 26 (1973). But on that same prejudice factor, the Court has also (and more recently) said that prejudice is a "necessary ingredient" that is "required to establish a violation of the Sixth Amendment Speedy Trial Clause." *Reed v. Farley*, 512 U.S. 339, 353 (1994).

¶128 As I understand how this is supposed to work, all factors matter, but they don't all matter equally. Instead, the prejudice factor is essentially first among equals, and in the absence of demonstrated prejudice, a defendant likely cannot establish that his right to a speedy trial was violated.

¶129 The reason for this prejudice-tilted construct is the remedy that is associated with a Sixth Amendment speedy trial violation. The Supreme Court has "repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, most constitutional errors can be harmless." *Washington v. Recuenco*, 548 U.S. 212, 218 (2006) (quotation simplified). The exception to this, of course, is

for cases involving structural error, wherein prejudice is presumed. *See State v. Bunker*, 2019 UT App 118, ¶ 10, 446 P.3d 153. But the Court has "found structural errors only in a very limited class of cases," *id.* (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)), and it has further cautioned that structural errors are indeed "rare," *Recuenco*, 548 U.S. at 218.

¶130 The "only possible remedy" for a violation of the Sixth Amendment right to a speedy trial is the dismissal of the charges. *Strunk v. United States*, 412 U.S. 434, 440 (1973) (quotation simplified). As a result, if a court were to hold that a defendant had established a violation of this right without a showing of prejudice, the court would essentially be treating a speedy trial violation as if it were a new form of structural error.

¶131 But *Barker* accounted for this, albeit in something of a curious way: it made prejudice part of the test itself, thus contemplating that prejudice does play some role in this analysis. But by making prejudice part of the test, *Barker* left it to the courts to determine how to balance prejudice alongside the other three factors.

¶132 To avoid inadvertently converting a speedy trial violation into a form of structural error, many courts have concluded that a defendant must affirmatively demonstrate prejudice unless the other three factors all weigh so heavily in the defendant's favor that prejudice can safely be presumed. *See, e.g.*, *United States v. Reagan*, 725 F.3d 471, 487 (5th Cir. 2013) ("Once a speedy trial analysis is triggered, the court determines whether the first three *Barker* factors weigh so heavily in favor of the defendant that prejudice is presumed. In the absence of such a presumption, the defendant must affirmatively demonstrate prejudice." (quotation simplified)); *United States v. Machado*, 886 F.3d 1070, 1081 (11th Cir. 2018) (holding that a "defendant must demonstrate actual prejudice unless each of the first three factors weighs heavily against the government" (quotation simplified)); *State v. Flowers*,

503 A.2d 1172, 1177 (Conn. 1986) ("Thus, an affirmative showing of actual prejudice is not essential to a speedy trial claim when the defendant is able to show that the other three factors weigh heavily against the State."); *State v. Griffin*, 274 A.3d 558, 565 (N.H. 2022) ("Although we typically require a defendant to demonstrate actual prejudice from a delay to prevail on a speedy trial claim, when a defendant does not—or cannot—articulate the particular harm caused by the delay, we inquire whether the length and reason for the delay weigh so heavily in the defendant's favor that prejudice need not be specifically demonstrated."); *State v. Garza*, 212 P.3d 387, 400 (N.M. 2009) ("However, if the length of delay and the reasons for the delay weigh heavily in [the] defendant's favor and [the] defendant has asserted his right and not acquiesced to the delay, then the defendant need not show prejudice for a court to conclude that the defendant's right has been violated."); *Fairbourn v. State*, 2020 WY 73, ¶ 59, 465 P.3d 413 ("Should the defendant fail to demonstrate prejudice, the other three *Barker* factors must weigh heavily in his favor to establish a speedy trial violation." (quotation simplified)). By structuring the *Barker* analysis along these lines, these courts assess *Barker* prejudice under *Barker*'s full four-factor rubric, but they do so while still ensuring that, as with most of our other constitutional rights, reversal of a conviction happens only when the defendant was prejudiced.[11]

---

11. As noted, the Supreme Court has held that in cases of "excessive" delay, speedy trial prejudice can be presumed, and the reason for this is the likelihood that an exceedingly long delay might impair the defendant's ability to "prove or, for that matter, identify" how he was prejudiced. *United States v. Doggett*, 505 U.S. 647, 655 (1992). In such a circumstance, the exceedingly long delay essentially satisfies the requirement from these cases that the defendant must show prejudice in the absence of a strong showing on all the other factors. But as also noted, this case does

(continued…)

¶133   Other courts have chosen to elevate prejudice in a slightly less structured way. The Tenth Circuit, for example, has held that although a "showing of prejudice may not be absolutely necessary in order to find a Sixth Amendment violation," courts should "have great reluctance to find a speedy trial deprivation where there is no prejudice." *United States v. Gould*, 672 F.3d 930, 939 (10th Cir. 2012) (quotation simplified); *see also United States v. Frias*, 893 F.3d 1268, 1275 (10th Cir. 2018) (finding no Sixth Amendment violation where all but the fourth *Barker* factor weighed at least slightly in the defendant's favor); *cf. United States v. Margheim*, 770 F.3d 1312, 1329 (10th Cir. 2014) ("However, in most circumstances, failure to specify prejudice will eviscerate the defendant's [speedy-trial] claim.").

¶134   And in a somewhat similar vein, many other courts have simply held that prejudice should be considered the prime or most important factor in the *Barker* analysis. The Utah Supreme Court has suggested as much. *See State v. Ossana*, 739 P.2d 628, 631 (Utah 1987) ("Finally *and most importantly*, *Barker* requires an inquiry into whether [the] defendant was prejudiced by the delay." (emphasis added)). And on this front, other courts have been more overt. *See, e.g., United States v. Shulick*, 18 F.4th 91, 102 (3d Cir. 2021) (referring to prejudice as "the most important factor in the *Barker* analysis"); *United States v. Lozano*, 962 F.3d 773, 781 (4th Cir. 2020) ("Prejudice, while not essential to the establishment of a violation of the right, is a prime issue and a critical factor." (quotation simplified)); *Symdon*, 689 F.3d at 752 ("Prejudice is the most important of the four *Barker* factors."); *State v. Leslie*, 708 P.2d 719, 725 (Ariz. 1985) (en banc) (holding that of "these four factors, the length of the delay is the least conclusive and the prejudice suffered by the defendant is the most important"); *State v. Lloyd*, 440 A.2d 867, 872 (Conn. 1981) ("[T]he linchpin of the speedy trial claim is a showing of prejudice . . . ."); *Shaw v. State*, 645 So. 2d 68,

---

not present such a circumstance, because there is no claim here that the delay qualifies as "excessive" for purposes of this test.

70 (Fla. Dist. Ct. App. 1994) ("Actual prejudice is the final and most important factor . . . ."); *State v. Brackett*, 377 P.3d 1082, 1090 (Idaho Ct. App. 2016) ("The nature and extent of prejudice is the most important of the *Barker* factors."); *State v. Rodriguez*, 494 P.3d 155, 163 (Kan. Ct. App. 2021) ("The lack of prejudice to the defendant weighs heavily in applying the *Barker* analysis."); *Phillips v. State*, 227 A.3d 779, 795 (Md. Ct. Spec. App. 2020) ("The most important factor in the *Barker* analysis is whether the defendant has suffered actual prejudice." (quotation simplified)); *Berryman v. State*, 337 So. 3d 1116, 1133–34 (Miss. Ct. App. 2021) ("In practice, *Barker*'s fourth factor—prejudice—often proves to be the most important in the analysis. While an affirmative demonstration of prejudice is not strictly necessary to prove a denial of the constitutional right to a speedy trial, the absence of prejudice may outweigh the other three factors." (quotation simplified)); *Coleman v. State*, 640 S.W.3d 159, 166 (Mo. Ct. App. 2022) ("The fourth and most important [*Barker*] factor is prejudice to the defendant."); *State v. Montoya*, 2015-NMCA-056, ¶ 25, 348 P.3d 1057 ("The heart of the speedy trial right is preventing prejudice to the accused."(quotation simplified)); *State v. Berry*, 141 S.W.3d 549, 568 (Tenn. 2004) ("The most important question, although not determinative in every case, is whether the delay caused any prejudice to the defendant."); *State v. Turner*, 2013 VT 26, ¶ 12, 70 A.3d 1027 ("Finally, the fourth factor looks at the actual prejudice as a result of the delay. This is the most important factor.").

¶135  I agree with the courts that have held that unless the other factors all weigh heavily in the defendant's favor, some affirmative showing of actual prejudice is required for the defendant to prevail on his speedy trial claim. Again, without such a requirement, a speedy trial violation would essentially become a new form of structural error, and I don't believe that the Constitution requires that outcome. At minimum, however, I also agree with the courts that have held that prejudice should at least be considered the most important of the *Barker* factors and that, in

the absence of demonstrated prejudice, a speedy trial claim should normally be rejected.

¶136 With all this in mind, I now turn to the question of how to balance the four factors in this case, accounting for their interrelated nature, the unique circumstances of this case, and the ultimate primacy of prejudice. Again, by way of something of recap, I view the factors as follows.

¶137 First, it's true that the actual length that it took to prosecute Hintze was two years. But courts commonly assess *Barker*'s length factor and its prejudice factor together. *See, e.g., Doggett*, 505 U.S. at 656 (explaining that the "importance" of the prejudice factor "increases with the length of delay"); *Ossana*, 739 P.2d at 631 ("*Barker* requires an inquiry into whether [the] defendant was prejudiced by the delay."); *Thompson-Jacobson*, 2022 UT App 29, ¶ 11 (explaining that "the extent to which the delay stretches" beyond the minimum to justify review is "relevant because the presumption that pretrial delay has prejudiced the accused intensifies over time" (quotation simplified)). Putting them together here, I think that what really matters in this case is that the effective length of the delay was six months. Again, Hintze didn't even know about this case for the first eighteen months after the charge was filed, so there's no possibility that he suffered any anxiety or stress from the pending charge at that time. And because of Hintze's conviction in Case 3226, even Hintze agrees that he would have been incarcerated through at least March 2020 for that unrelated reason anyway. Since he was convicted by plea in September 2020, I believe that our resolution of this case must turn on the six months between March and September 2020.

¶138 Second, I agree that the reason for the delay weighs against the State. But no one has ever suggested that the State delayed prosecuting Hintze deliberately or for any tactical reason. Instead, by all accounts, it appears to have been an inadvertent mistake. Such mistakes of course shouldn't happen. And I agree that in a

case in which a proper balancing of the other factors weighed against the State, even a negligent delay could support a violation (and, hence, a dismissal). But as discussed shortly, I don't believe this is so here.

¶139   Third, I agree that if a defendant makes a timely assertion of his right to a speedy trial, the third factor should ordinarily weigh in his favor. But again, the idea behind that factor seems to be that once the defendant asserts his constitutional right to a speedy trial, the State must do its part to see that the defendant receives the speedy trial that he's now requested. And that's exactly what happened here: after Hintze asserted the right to a speedy trial in his August 2020 motion to dismiss, the State promptly responded to the motion, the court ruled on the motion in September 2020, and the case was then resolved by way of a plea that very same month. In a circumstance like this one, where the defendant's assertion of the right was so quickly followed by the State's active participation in resolving the case, I have difficulty seeing how this factor could compel us to conclude that the Sixth Amendment was somehow violated. In these particular circumstances, I believe that this factor is more appropriately viewed as something of a wash.

¶140   Fourth, we're left with prejudice. As discussed at length above, I don't believe that Hintze has established that he was prejudiced by the delay in this case. His prejudice arguments are inherently speculative, so I believe that they fail for this reason alone. And on their merits, his arguments ask us to assume that the Board would have placed little stock in the fact that, after being convicted of two sex offenses involving teenage girls, Hintze now stood convicted of unlawfully being in a public park (while with yet another teenage girl, no less). This runs contrary to how I think this would have likely played out.

¶141   So putting these all together, here's how I see this case balancing out: Hintze knew about this charge for six months

before he pleaded guilty to it, the earlier delay wasn't the product of any deliberate action by the State, the case was resolved about a month from the time that Hintze first asserted his right to a speedy trial, and there's no actual proof that the delay (whether it be six months or two years) caused Hintze any actual prejudice. Under this mix of circumstances, I don't believe that the Sixth Amendment was violated. I would therefore affirm the district court's denial of Hintze's motion to dismiss, and I respectfully dissent from the majority's contrary conclusion.

## II. Fourth Amendment Seizure

¶142 Hintze also challenges the district court's denial of his motion to suppress, and the issue has been fully briefed and capably argued by both parties. Because I would reject Hintze's argument about the alleged speedy trial violation, I would accordingly reach this issue. And in my view, we should reverse the district court's denial of Hintze's motion to suppress. *Cf. State v. Larrabee*, 2013 UT 70, ¶ 42 n.1, 321 P.3d 1136 (Lee, J., dissenting) (explaining that a "core role of a dissenting opinion is to outline the grounds on which it would dispose of the case—whether or not those grounds are identical to those addressed by the majority" and then setting forth an "alternative argument for reversal" that was advanced by the defendant but not reached by the majority).

¶143 The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. To determine whether there was an unreasonable search or seizure, courts must first determine the nature of the police-citizen encounter at issue. There are three types:

> A level one encounter occurs when a police officer approaches a citizen and asks questions, but the person is not detained against his will and remains free to leave. A level two encounter occurs when a

police officer temporarily seizes an individual because the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime. Finally, a level three stop occurs when a police officer has probable cause to believe that a crime has been committed and effects an arrest of the suspect.

*State v. Mitchell*, 2019 UT App 190, ¶ 12, 455 P.3d 103 (quotation simplified).

¶144 As noted, Hintze's motion was targeted at the moment when the first officer asked him for his name. This was the moment of demarcation because, again, once officers learned Hintze's name, they had a basis for discovering that Hintze was a sex offender and not legally permitted to be at the park. Given this, the question is what kind of encounter was underway when the officers asked Hintze for his name: was it a consensual level one encounter (which is the State's view)? Or, instead, was it a level two encounter that already amounted to a seizure (which is Hintze's view)? If it was a level two encounter at that point, we must then determine whether that seizure was justified by reasonable suspicion.

¶145 As set forth in Part II.A, I believe that Hintze had already been seized when the officer asked him for his name. As set forth in Part II.B, I believe that this seizure was not supported by reasonable suspicion.

A.  Seizure

¶146 A Fourth Amendment seizure occurs when an officer "by means of physical force or show of authority, terminates or restrains" a person's "freedom of movement." *State v. Anderson*, 2015 UT 90, ¶ 10, 362 P.3d 1232 (quotation simplified). "A show of authority is sufficient to constitute a seizure if in view of all of the circumstances surrounding the incident, a reasonable person

would have believed that he was not free to leave." *Id.* (quotation simplified). "Thus it is a hypothetical reasonable person's interpretation of an officer's actions—not the officer's intent—that determines whether an individual has been seized by an officer through a show of authority." *Id.* Although this is a circumstance-dependent inquiry, it is still "helpful" to examine past cases in which courts addressed these issues and then "compar[e]" those cases "to our facts." *State v. Bean*, 869 P.2d 984, 986 (Utah Ct. App. 1994).

¶147  In my view, there are several circumstances that are of particular importance to our resolution of this case.

¶148  **First, the presence of multiple armed and uniformed police officers.** When determining whether "a reasonable person would have believed that he was not free to leave," courts commonly look to whether there was a "threatening presence of several officers." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In assessing this, courts look to such things as the number of officers, the officer-to-citizen-ratio, whether the officers were uniformed, and whether the officers were armed.

¶149  In a recent case, for example, we concluded that "the presence of four armed and uniformed officers constituted a show of authority," particularly because the officers "outnumber[ed] [the suspects] two-to-one." *State v. Bui-Cornethan*, 2021 UT App 56, ¶ 22, 490 P.3d 191. In another case, we held that a suspect was seized in part because he "was confronted with two uniformed officers," each of whom was equipped "with badge, gun, the whole works." *Salt Lake City v. Ray*, 2000 UT App 55, ¶ 13, 998 P.2d 274 (quotation simplified). By contrast, we reached a different conclusion when "only two officers" questioned "five males." *State v. Merworth*, 2006 UT App 489, ¶ 9, 153 P.3d 775. And we also held that there was no seizure in a case where "only one officer" questioned a single suspect, and, although the officer was armed, he "used no show of force such as drawing his weapon or flashing

his police lights." *State v. Adams*, 2007 UT App 117, ¶ 14, 158 P.3d 1134.

¶150   In this case, three officers approached two citizens, so the officers outnumbered the citizens. Moreover, all three officers were uniformed, and as the district court put it, "[t]hey certainly had weapons[, although] none of them [were] drawn." Although not dispositive, these circumstances support a conclusion that this encounter constituted a seizure.

¶151   **Second, the positioning of the officers' bikes.** An "officer's positioning of her vehicle is certainly a factor that" can weigh "in favor of finding under a totality of the circumstances that [a] defendant was seized." *State v. Struhs*, 940 P.2d 1225, 1228 (Utah Ct. App. 1997). Such positioning is particularly relevant if the officer uses his vehicle to block a citizen's path, because this would naturally be seen as infringing on the citizen's "freedom of movement." *Id.*; *see also State v. Smith*, 2022 UT 13, ¶¶ 3, 26, 513 P.3d 629 (concluding that officers seized a suspect when they "parked in a manner intended to prevent [the suspect's] vehicle from exiting and to allow the officers to shine a spotlight directly into the vehicle" (quotation simplified)); *State v. Smith*, 781 P.2d 879, 882 (Utah Ct. App. 1989) (concluding that the defendant's "liberty was restrained and a seizure occurred," in part, because the officer "blocked [the] defendant's car" with his own).

¶152   By contrast, we've held that the positioning of an officer's vehicle did not suggest that there was a seizure when the officer "parked in front of [a suspect's] vehicle at a forty-five degree angle," "did not block the vehicle in," and left room so that it was "possible for [the suspect] to drive away." *State v. Merlen*, 2002 UT App 181U, para. 2. Other courts have similarly concluded that there wasn't a seizure in situations in which officers did not effectively block the citizen in. *See, e.g.*, *United States v. Tafuna*, 5 F.4th 1197, 1201 (10th Cir. 2021) (considering it important that although the officer's "police vehicle was parked at an angle so

that it faced the driver's side of the car, it did not obstruct the car's path of exit or otherwise impede Defendant's movement"); *cf. State v. Rigby*, 2016 UT App 42, ¶ 21, 369 P.3d 127 (acknowledging "Utah's historical pattern of tracking federal law in [the Fourth Amendment] area both in principle and in practice").

¶153   Here, the officers were on bikes, not in cars. But the same analysis would apply, particularly where, as here, the citizens were on foot as opposed to being in cars of their own. *See, e.g., People v. Taylor*, 2018 CO 35, ¶ 12, 415 P.3d 821 (explaining that an officer on bike patrol who stopped his bike and left "room on that portion of the sidewalk for [the suspect] to keep walking" did not seize the suspect). So, as with a car case, the question is whether the officers' vehicles (i.e., their bikes) were positioned such that they would restrain Hintze's freedom of movement.

¶154   They were. The bodycam footage from the lead officer was introduced below and is in the record. This video shows that the three officers pedaled up to the bench where Hintze and the teenager were sitting. The bench was on a concrete patch that was alongside a paved path, there was a fence behind the bench (at something of an angle), and there was a busy road behind the path. To either side of the bench was overgrown grass. The officer who questioned Hintze was at the right of this group of officers, and he stopped on the path just a few feet in front of Hintze. This officer got off his bike and parked his bike to his right, near the end of the bench on the side where Hintze was sitting. This officer and his bike would have been in the way if Hintze had tried walking away on the path in that direction. A second officer was positioned in the middle of the trio. He parked his bike immediately in front of Hintze, positioning his bike mere inches from Hintze's knee. That second officer and a third officer who was behind him were positioned on the portion of pavement to the left of Hintze and the path in that direction, thereby blocking Hintze in that direction as well. Thus, from the very outset of this encounter, Hintze was effectively surrounded, and a reasonable

person would have believed that he did not have "freedom of movement." *Struhs*, 940 P.2d at 1227.

¶155 The State nevertheless contends that a person in this position would have felt free to leave anyway. The State bases this assertion on *I.N.S. v. Delgado*, 466 U.S. 210 (1984), and *United States v. Drayton*, 536 U.S. 194 (2002). Relying on those cases, the State argues that government agents can "directly question[] individuals about potential criminal or quasi-criminal" activities "while other government agents [stand] by the exits" without effectuating a seizure. Unlike the State, however, I believe *Delgado* and *Drayton* are distinguishable in two key ways.

¶156 First, *Delgado* and *Drayton* both involved police-citizen encounters in spaces in which the individuals had already submitted themselves to some degree of confinement before encountering the officers. In *Delgado*, for instance, government agents interviewed factory workers inside several factories. 466 U.S. at 212. When assessing whether agents had done anything to restrict the workers' freedom of movement, the Supreme Court thought it significant that "when people are at work[,] their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *Id.* at 218. The Court accordingly concluded that the agents' questioning did not "prevent" the workers "from moving about the factories" because it did not limit the workers' freedom of movement more than their own employment already had. *Id.*

¶157 *Drayton* involved a different setting but a similar dynamic. There, police officers approached and questioned individuals on board a bus. 536 U.S. at 197–98. Reviewing a Fourth Amendment challenge to the questioning, the Court thought it significant that the passengers had already restricted their own movement by choosing to enter and then stay on the bus. *Id.* at 201–02. Relying on *Florida v. Bostick*, 501 U.S. 429 (1991), the Court reinforced the

notion that "the traditional rule, which states that a seizure does not occur so long as a reasonable person would feel free to disregard the police and go about his business," is "not an accurate measure of the coercive effect of a bus encounter" because a "bus rider's movements are" already "confined" by the rider's decision to get on the bus. *Drayton*, 536 U.S. at 201 (quotation simplified); *see also Bostick*, 501 U.S. at 435–36 (explaining that "the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter" when "the person is seated on a bus and has no desire to leave"). Thus, although individuals' "movements [are] 'confined' in a sense" while they sit on a bus, this restriction is "the natural result of [the bus rider's] decision to take the bus," which is a "factor independent of police conduct." *Bostick*, 501 U.S. at 436.

¶158 Unlike *Delgado*'s workers or *Drayton*'s passengers, Hintze did not encounter officers in a place in which he had already voluntarily restricted his own movement. Rather, at the time of this encounter, he was sitting on a park bench on an open and public path. Until officers arrived and positioned themselves between Hintze and the path, Hintze would have been entirely free to get up and leave. These cases are therefore distinguishable on that basis alone.

¶159 Second, in *Delgado*, "INS placed agents *near* the exits of the factory sites" and "*near* the factory doors." 466 U.S. at 218 (emphases added). The Supreme Court took note of this precise positioning, explaining that the "presence of agents *by* the exits posed no reasonable threat of detention to these workers while they walked throughout the factories on job assignments." *Id.* at 219 (emphasis added). The positioning in *Drayton* was similar. There, one officer was near the front of the bus; but even so, the Court thought his presence there was non-coercive because, by kneeling on the driver's seat and facing the rear of the bus, he was not "blocking the aisle or otherwise obstructing the bus exit." 536

U.S. at 198. The same was true for his partner, who approached passengers while standing "next to or just behind each passenger with whom he spoke" to "*avoid blocking the aisle.*" *Id.* (emphasis added).

¶160   This stands in contrast to what happened here. Again, the three officers positioned themselves and their bikes in between Hintze and the path by which he would conceivably leave. If he tried walking away from the encounter, Hintze would have had to brush by these uniformed officers or their bikes. I'm hard pressed to imagine that an ordinary citizen would feel comfortable doing so in an attempt to terminate an encounter, particularly while the officers were in the act of asking him questions, and I'm likewise hard pressed to imagine that police officers would ever regard this as acceptable behavior. This is therefore strongly suggestive that a seizure occurred.

¶161   **Third, the nature of the questioning.** An officer can "approach[] a citizen and ask[] questions" without moving beyond a level one encounter. *Mitchell*, 2019 UT App 190, ¶ 12. In this sense, officers do not seize a person by "merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions," or "by putting questions to him if the person is willing to listen." *Bostick*, 501 U.S. at 434 (quotation simplified).

¶162   But even so, the "manner of questioning, the content of the questions, and the context in which the questions are being asked can convert mere questioning into a level two seizure if, under all of the circumstances, a reasonable person would not feel free to leave." *State v. Alverez*, 2006 UT 61, ¶ 12, 147 P.3d 425 (quotation simplified). With respect to the manner of questioning, "the use of language or tone of voice indicating that compliance with the officer's request might be compelled" can suggest that the conversation is coercive. *Mendenhall*, 446 U.S. at 554. And with respect to the content of the questions, questions that are

"accusatory in nature" are suggestive that a detention is underway. *Alverez*, 2006 UT 61, ¶ 12.

¶163 Here, the district court found that the officers' "tone of voice was normal," and Hintze hasn't challenged that finding on appeal. But even so, I regard the content of the questioning as having been at least somewhat accusatory in nature from essentially the start of the encounter. The officers did not approach Hintze and begin by casually "asking him if he [was] willing to answer some questions" or anything similar. *Bostick*, 501 U.S. at 434 (quotation simplified). Rather, as the officers approached, the first officer asked, "[H]ow's it going guys? How old are you guys?" As noted by the district court, this question about Hintze's and the teenager's ages came "very quick[]." After Hintze and the teenager responded, the first officer then asked Hintze about his relationship to the teenager. When Hintze said that they were siblings, the officer told Hintze that he thought Hintze didn't "look like" the teenager's sibling. The officer then immediately asked Hintze several follow-up questions about the nature of his relationship to the teenager, and Hintze's shifting answers were in response to those questions.

¶164 As discussed below, it's true that a person's shifting story can contribute to a determination that reasonable suspicion existed. But the initial issue here is whether Hintze had already been seized. And on that front, it matters that these officers didn't casually approach Hintze and ask him if he was willing to answer questions; rather, when they approached Hintze, the lead officer *started* by asking questions about his age and relationship to the teenager (questions that by their nature already suggested some degree of suspicion by the officer), and when Hintze answered the first question about his relationship to the teenager, the officer responded by openly questioning the truthfulness of Hintze's answer. At that moment, the questioning had become accusatory. Because Hintze was now being asked accusatory questions, this, too, suggested that he was no longer "free to disregard the

questions, get [off the bench], and [walk] away." *Alverez*, 2006 UT 61, ¶ 12.

\* \* \* \* \*

¶165   This all leads back to the questions of whether a seizure occurred, and, if so, when. And again, when assessing this, we must consider the totality of the circumstances. So to recap, two citizens were approached by three uniformed officers, the officers were armed, and the officers almost immediately positioned themselves and their bikes between Hintze and the path that he would take if he tried to leave. After the lead officer asked about Hintze's relationship to the teenager, the officer asked follow-up questions that suggested that he thought Hintze was not telling him the truth. All of this occurred before the officer asked Hintze for his name, which is the question that led to the incriminating information about Hintze's sex offender status (and park visitation restrictions) and which is accordingly the information at issue in Hintze's motion to suppress.

¶166   Under these circumstances, I don't believe that an ordinary person in Hintze's position would have felt free to stand up, brush by the officers, ignore the pending accusatory questions, and terminate the encounter. Because of this, I agree with Hintze that he had been seized by the time he gave his name to the officers.

B.     Reasonable Suspicion

¶167   "Having determined that a level two Fourth Amendment seizure did occur in this case," I would then "turn to whether the officers had a reasonable and articulable suspicion of criminal activity in order to justify [the] detention." *Alverez*, 2006 UT 61, ¶ 13. "Reasonable suspicion requires an objectively reasonable belief that an individual is engaged in or is about to be engaged in criminal activity." *State v. Gurule*, 2013 UT 58, ¶ 32, 321 P.3d 1039 (quotation simplified). While "officers need not rule out the

possibility of innocent conduct, and the likelihood of criminal activity need not rise to the level required for probable cause, reasonable suspicion must be supported by specific and articulable facts and rational inferences," and it "cannot be merely an inchoate and unparticularized suspicion or hunch." *Id.* (quotation simplified). When conducting this analysis, we "look to the totality of the circumstances to determine whether, taken together, the facts warranted further investigation by the police officer[s]." *Alverez*, 2006 UT 61, ¶ 14 (quotation simplified).

¶168 "Here, the parties do not contest the objective facts apparent to" the officers "or the order in which they occurred." *State v. Simons*, 2013 UT 3, ¶ 23, 296 P.3d 721. I think the potentially relevant circumstances here are these:

- Officers saw Hintze and a teenage girl sitting on a park bench together.

- Hintze and the teenager had different complexions.[12]

- Officers approached the two, asked them their ages, and asked them about their relationship.

- In response to the question about their ages, officers learned that Hintze was twenty-three and the teenager was thirteen.

- After Hintze gave an initial response to the question about their relationship, the questioning officer suggested that he thought Hintze was not telling the truth.

---

12. The officer seemed to think that the difference in complexions mattered because it might suggest that the two were not biologically related.

- In response to further questioning, Hintze gave shifting answers about his relationship to the teenager.

- Moments later, the officer asked Hintze for his name.

The question, then, is whether the circumstances prior to Hintze being seized supported a reasonable suspicion that criminal activity was underway, thereby justifying the investigatory detention.

¶169   It's true that Hintze and the teenager were of different ages and complexions and were sitting together on a park bench. But to support a seizure—i.e., to give officers the authority to restrain their movement—there must have been a reasonable suspicion that "criminal activity [was] afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Here, when officers saw the pair, they weren't holding hands or kissing; in fact, they weren't even touching each other. They also weren't hiding or sitting in a secluded place. Rather, they were eating snacks on a public park bench in the middle of the day. Moreover, they didn't "attempt to leave the area when the police approached." *State v. Goddard*, 2021 UT App 124, ¶ 27, 501 P.3d 1188; *cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (explaining that an individual's "unprovoked flight" or "evasive behavior" can be "pertinent" "in determining reasonable suspicion"). Instead, as officers approached, the two remained seated on the bench, apparently unconcerned. So without something more, I don't believe that there would be a reasonable basis at that point for suspecting that something criminal was afoot.

¶170   The "something more" that the State points to is the fact that Hintze then gave shifting answers to the lead officer's questions about the nature of his relationship with the teenager. And I do recognize that a person's shifting answers to questions from an officer can contribute to reasonable suspicion. *See State v. Duhaime*, 2011 UT App 209, ¶ 15, 258 P.3d 649 (recognizing that

"vague, inconsistent or evasive answers" can support reasonable suspicion (quotation simplified)); *State v. Little*, 2012 UT App 168, ¶ 5, 280 P.3d 1072 (noting that "the officers developed additional reasonable suspicion upon hearing the inconsistent stories told by" the defendant and his mother).

¶171   But even so, I believe that Hintze had already been seized before he started giving those shifting answers. Again, three uniformed officers approached Hintze and positioned themselves and their bikes around him, positioning themselves directly between him and the path by which he would conceivably leave. This was likely enough by itself to constitute a seizure. But even if it wasn't, I believe that Hintze was seized when the first officer started the conversation by almost immediately asking accusatory questions and then questioning Hintze's initial answers.

¶172 Thus, even before Hintze's story had started to meaningfully shift, the officers had already blocked his movement and communicated to him that he was suspected of wrongdoing. At that moment, a reasonable person would not have felt free to leave. But at that moment, there also wasn't yet a reasonable basis for suspecting that Hintze was engaged in or about to engage in criminal conduct. Because of this, I believe that the district court erred in denying Hintze's motion to suppress.

¶173   In short, I disagree with the majority's conclusion that Hintze's right to a speedy trial was violated. But even so, I agree with Hintze that officers unlawfully seized him without reasonable suspicion. I would therefore remand the case for further proceedings consistent with that result.

_____